680 So.2d 1242 (1996)
Fred E. SALLEY, d/b/a Salley & Associates
v.
COLONIAL MARINE INDUSTRIES, INC. and Colonial Oil Industries, Inc.
No. 95-CA-2215.
Court of Appeal of Louisiana, Fourth Circuit.
September 11, 1996.
*1243 Lee M. Peacocke, Salley & Associates, New Orleans, for Plaintiff/Appellant Fred E. Salley.
John C. Anjier, Liskow & Lewis, New Orleans, George L. Lewis, Adams & Ellis, Savannah, GA, for Defendants/Appellants, Colonial Oil Industries, Inc. and Colonial Marine Industries, Inc.
Before CIACCIO, WALTZER and MURRAY, JJ.
MURRAY, Judge.
Fred E. Salley, d/b/a Salley & Associates, a sole proprietorship law firm, filed a suit on open account against two Georgia corporations, Colonial Marine Industries, Inc. ("Colonial Marine") and Colonial Oil Industries, Inc. ("Colonial Oil"), seeking recovery of $15,195.31 for legal services rendered from November 19, 1992 through April 29, 1993. Both corporations filed exceptions of lack of personal jurisdiction asserting that neither had sufficient contacts with this state to justify defending a suit in a Louisiana court. The exceptions were overruled. The defendants *1244 then answered the suit, denying liability because Mr. Salley had been retained on behalf of a separate but related corporation, Colonial/Gulfship Marine, Inc. ("Colonial Gulfship"). Following a bench trial, judgment was rendered against both defendants for the amount claimed plus interest, but denying Mr. Salley's claim for attorney fees under the open account statute.
Mr. Salley appeals the denial of his claim for attorney fees and seeks an additional award for this appeal. Colonial Marine and Colonial Oil appeal the trial court's failure to maintain their exceptions to personal jurisdiction as well as the judgment on the merits.

FACTS
The trial testimony and documentary evidence establish the following facts:
Colonial Oil, a Georgia corporation headquartered in Savannah, is a wholesale petroleum operating company owned by the Demere family and headed by Robert Demere, Jr. It is also the parent corporation of a group of wholly-owned subsidiaries, at one time including Colonial Marine, Colonial Gulfship and Colonial ATL (Bermuda) Ltd. ("Colonial ATL").
Colonial Marine, also incorporated in Georgia and operating out of Savannah, was formed in March 1991 in order to acquire the operating assets, effective April 1, 1991, of another company. John B. Demere, Robert Demere's brother, was President and Chairman of the Board of Colonial Marine until May 1, 1993, when he began working for another Colonial Oil subsidiary. According to John Demere, Colonial Marine was "a marine service company, acting as an agent and managing agents and technical managers" in the shipping industry.
Gulfship Marine, Inc. ("Gulfship Marine") was a Texas corporation owned by Kenneth P. Mayeux. Colonial Gulfship was incorporated by the Demere family in Texas in July 1992 in anticipation of the purchase of the net operating assets of Gulfship Marine from Mr. Mayeux. John Demere acted on behalf of Colonial Oil in negotiating for the eventual purchase of Gulfship Marine, and at an unspecified date became Vice President, then Vice Chairman and Director, of Colonial Gulfship in addition to his position at Colonial Marine.
In late July 1992, John Demere phoned Kenneth Nash at his New Orleans-area residence to offer him the position of part-time cargo claims consultant "for a company which Colonial Marine Industries was taking over in New Orleans."[1] In this initial phone call, Mr. Demere identified himself as the President of Colonial Marine, but he did not name any particular entity for which Mr. Nash would be working. He explained that he was dissatisfied with the current claims processing in the newly acquired firm and wanted Mr. Nash to start immediately, replacing Larry Mackey.
A few days later, Mr. Nash reported for work at an office in New Orleans' International Trade Mart. "Colonial Gulfship" was painted on the office door. Mr. Nash began at once to review files and current operations, and by the time Mr. Demere phoned later that day he was able to report that Mr. Mackey's help would be needed for a transition period: the files were "in shambles" and unanswered correspondence "had been sitting there in the basket for weeks." Additionally, there was no schedule of claims pending, the amounts at issue and/or potential settlement values, etc.
As Mr. Nash endeavored to organize things over the next few weeks, he had almost daily phone contacts with John Demere to obtain information and instructions.[2] Mr. Demere told him to sign claims correspondence for "Colonial/Gulfship Marine, as agents for Antilles Lloyd (Bermuda)." Mr. Nash was to obtain authorization from Kenneth Mayeux for any settlements he negotiated, but the settlement checks would be *1245 issued from Colonial Marine in Savannah. The only stationery Mr. Nash used during the entire time that he worked for John Demere was Colonial Gulfship letterhead. He eventually was furnished a "company car" that he picked up at Colonial Gulfship's office in Houston. The title identified Gulfship Marine as the owner, but Mr. Nash recalled that it was insured through Colonial Oil.
As an independent contractor, Mr. Nash sent a monthly invoice for his services and parking expenses to Scott Ransom, Vice President of Finance and Administration for Colonial Marine, and was paid by checks from that firm. Francis Brown, Vice President of Finance for Colonial Oil, testified that there were always separate bank accounts for Colonial Oil and Colonial Marine, but Colonial Marine's "major account was handled out of Colonial Oil." He explained that Mr. Nash was paid through and by Colonial Marine because "[a]s various types of agents for different shipping interests as Colonial Marine Industries is, they routinely collect funds and disburse payments on behalf of these various customers. Some sort of legal term, some sort of agency relationship."
In late October Mr. Nash became concerned that the handling of certain claims by Gulfship Marine might expose Colonial Gulfship, Colonial Marine and/or Colonial Oil to liability for these claims.[3] Mr. Nash discussed his concerns with John Demere, and suggested that he be allowed to consult an attorney other than the attorneys handling the litigation of the claims at issue. Mr. Demere testified that although he felt there was no apparent liability, he agreed that Mr. Nash could consult Fred Salley, a New Orleans lawyer who was known to Mr. Nash through various marine trade associations.
Mr. Nash met with Mr. Salley on November 19, 1992, to discuss his concerns and to review the available documents. This meeting took place at Mr. Nash's office. According to Mr. Salley, after he had seen the state of affairs and had an idea of the source of the problems, he made it clear to Mr. Nash that he would not work for Mr. Mayeux or any of his companies, especially since expedited service was requested. Mr. Nash, who described himself as a consultant for Colonial Marine, assured Mr. Salley that he would not be working for Kenneth Mayeux, but for John Demere in Savannah. Since Mr. Salley was familiar with the Colonial "group" from his years of admiralty practice, he accepted the employment. He understood that he was to focus primarily on whether the stale and apparently mishandled cargo claims could "end up being a liability for any of the Colonial side of the deal, which was Colonial Marine Industries and Colonial Oil."
The following day Mr. Salley sent an engagement letter in which he stated he had been retained "on behalf of the current ownership and management of Antilles Lloyd (Bermuda) Ltd and Colonial Gulfship Marine Inc." This letter, which outlined the scope of work to be performed as well as the anticipated fees and costs, was addressed to Mr. Nash at Colonial Gulfship. Mr. Nash then forwarded a copy of the engagement letter to Mr. Demere for approval. Mr. Salley testified that he deliberately named "the current ownership and management" of the companies in an effort to be circumspect. He understood that many of the people working in Mr. Nash's office were Mr. Mayeux's people. Because he had observed that access to files and correspondence in the office was unrestricted, he was concerned that a notation that a document was privileged would not ensure its being kept confidential. Additionally, since he was essentially retained to examine whether, and on what grounds, liability for both cargo claims and litigation costs could be avoided, he did not want to chance an explicit statement that might be seen by the lawyers defending the pending *1246 suits, much less the government attorneys prosecuting them.[4] Since the letter was intended only for Mr. Nash and Mr. Demere, both of whom he understood worked for Colonial Marine, Mr. Salley saw no need to specify his client further.
From November 20 to December 15, 1992, Mr. Salley made numerous requests of Mr. Nash for factual information. Mr. Nash obtained most of the information requested from Mr. Demere or Mr. Mayeux and relayed the information and/or documents to Mr. Salley's office. Mr. Salley had no direct contact with Mr. Mayeux during the course of this representation. However, he received a copy of a December 8, 1992, memo written by Mr. Mayeux to Mr. Nash after he had read Mr. Salley's engagement letter.[5] At one point Mr. Salley requested particulars about the acquisition of Gulfship Marine and Antilles Bermuda (the two Mayeux companies) and corporate structure. Mr. Nash testified that he relayed this request to Mr. Demere who told him to "have Salley call Wiley Ellis [Colonial Oil's attorney who was handling the acquisition] in Savannah," and gave him Mr. Ellis' phone number. Mr. Nash also testified that John Demere called him shortly after this referral. Mr. Demere was very angry, and told him that Mr. Salley had told Mr. Ellis that there was potential liability of $1.2 million. John Demere told Mr. Nash to call his brother Robert, and reassure him that the potential liability of the Colonial group was considerably less than Mr. Salley had indicated to Mr. Ellis.
On December 15th, Mr. Salley faxed a draft opinion letter concerning potential successor liability to Mr. Nash, who relayed the letter to Mr. Demere. This document unambiguously reflects Mr. Salley's understanding that Colonial Oil had a binding agreement to purchase both the stock and assets of Gulfship Marine and Antilles Bermuda. Consequently, Colonial Oil was concerned about liability for pre-1991 claims for Antilles Lloyd's shipments. The only mention of Colonial Gulfship in the letter is in reference to "deductibles actually received and banked by Gulfship or Colonial Gulfship."
Mr. Salley substantially revised the opinion letter during a telephone conference between himself and Mr. Demere on December 18th. He testified: "I recall having Mr. Demere on the phone and I was sitting in front of the computer screen and physically making the changes and ... discussing the language that I thought we should use to accomplish most of what he requested." Mr. Salley sent a revised version of the opinion letter directly to Mr. Demere by fax on December 21st. The final version, dated December 24, 1992, addressed to Mr. Nash at Colonial Gulfship, was sent by fax to both Mr. Nash in New Orleans and to Mr. Demere in Savannah.[6]
Mr. Salley continued to assist Mr. Nash in presenting the successor liability issues to the underwriters. He subsequently was informed that his opinion letter was received favorably by the underwriters, who had agreed to reimburse one-half the cost of his services when paid. Mr. Salley also worked with Mr. Nash on minor cargo claims litigation issues.
Mr. Nash testified that he suggested that Mr. Salley keep his file open pending developments in the cargo claims litigation, and hold his billing for the legal services in abeyance. He also testified that Mr. Demere agreed to this suggestion. In March 1993, Mr. Demere asked Mr. Nash several questions concerning outstanding claims as well as Mr. Salley's fee for his services. Mr. Nash's response, dated March 22, was faxed to John Demere at Colonial Marine and included the statement that Mr. Salley "was in no rush to submit his invoice ... and he had not worked up his charges."
In early April 1993, Mr. Nash told Mr. Salley that "the deal was being changed" and *1247 the New Orleans office would be closed. Since Mr. Nash would no longer be working for Mr. Demere, he was instructed to box up the files for shipment to Savannah. On May 10th, Mr. Salley wrote to Mr. Demere at Colonial Marine:
[I]t would appear that the adjustments that were made in arrangements with Mr. Mayeaux [sic] may have been effective in reducing or eliminating exposure to your interests from litigation over old cargo claims incurred by other parties....
[W]e intended maintaining an open file on these multiple claims, ... with closure and billing for services around the end of 1993.... It had been my understanding that you were in basic agreement with this proposal, but I sense that your business plan and strategy may have changed over recent weeks, and you might prefer a more prompt closure and billing.... Please advise if you would prefer to have the file billed and closed now....
Eight days later, apparently in response to some interim communication, Mr. Salley sent his bill to Colonial Marine in Savannah, to the attention of Capt. Raju Mehrotra or John Demere. His cover letter stated in pertinent part:
I am attaching hereto, our bill through date, for reviewing and providing (at the request of Messrs. Ken Nash and John Demere) opinions and advices to Colonial... in connection with Colonial's planned acquisition of the assets of Colonial Gulfship Marine/Antilles Lloyd, Ltd. (Bermuda) et al.

.... as per Mr. Demere's request, we will maintain our files open, but in abeyance, in the event that developments necessitate your contacting us again about some of these matters.
After this letter and the attached bill were sent to Colonial Marine, Mr. Demere phoned Mr. Nash and asked him to negotiate a reduction in the amount charged. Mr. Nash responded to Mr. Demere's Houston office of Associated Transport[7] by fax on July 29th, indicating Mr. Salley had refused to reduce his fee because he felt his bill was "fair and reasonable" for the work done, an assessment with which Mr. Nash agreed. In a similar letter dated August 31, 1993, Mr. Nash reiterated this opinion, stating that "I think you agree that the final opinion was a good one especially that it covered all the points of concern to you and Colonial Marine Industries Inc. in regard to the potential liabilities which could be involved in the intended acquisition of the various Companies."[8]
Mr. Salley sent follow-up letters concerning his unpaid bill to the same individuals (John Demere or Capt. Mehrotra) at Colonial Marine on July 7 and September 23, 1993. Both of the follow-up letters reference the "fees and costs incurred on behalf of Colonial Gulfship." On October 8, 1993, Mr. Salley got his first response to these billings when he received a letter from Capt. Mehrotra advising him that his letter and bill were "forwarded to the responsible party, Antilles Lloyd (Bermuda) Ltd.... c/o Gulfship Chartering, Inc." in Houston. This was the first time that Mr. Salley was made aware that Colonial Marine was disputing liability for payment for his services.
On February 1, 1994, Mr. Salley sent a formal demand letter by certified mail to John Demere, Colonial Marine Industries, Inc., advising that the suggestion that Antilles Bermuda be billed produced no results. The only response was a March 28 letter from Wiley Ellis' Savannah law firm, stating that Antilles Lloyd (Bermuda) Ltd., d/b/a Colonial Atlanta Bermuda Ltd., had been placed into involuntary Chapter 7 bankruptcy.
*1248 Although Francis Brown testified that Colonial Oil purchased Gulfship Marine's net operating assets and acquired 100% of the stock of Antilles Bermuda from Mr. Mayeux on December 4, 1992, no documents establishing that the transfer had actually taken place and establishing the date of the purported transfer were offered at trial. In contrast to Mr. Brown's testimony on this subject, the December 8th memo to Mr. Nash from Mr. Mayeux, written after review of Mr. Salley's engagement letter, states that Colonial Oil had merely offered to purchase the stock/assets of those companies. Mr. Salley's final opinion letter dated December 24, 1992, included the statement that Colonial Oil's purchase of the stock of Antilles Bermuda and the assets of Gulfship Marine had not yet been completed. This letter was prepared following John Demere's review and correction of earlier drafts of the opinion letter that also stated that the transactions were not yet finalized.
Mr. Brown also testified that Colonial Oil sold Colonial Gulfship's stock to Kenneth P. Mayeux on May 1, 1993. However, he offered no explanation of this transfer or its timing. Nor was documentary evidence of this purported transfer offered at trial. Mr. Salley testified that he was never told that any of these transactions would affect who would be paying for his services.
Mr. Salley's suit, filed on May 6, 1994, alleged that he was hired by and performed services for defendant Colonial Marine, but that he had not been paid, despite amicable demand. He asserted as a second cause of action that he was retained on behalf of Colonial Oil as "the then owners and managers of Colonial Gulfship Marine, Inc." He alleged that Colonial Oil, therefore, was liable for his fees based upon "unjust enrichment, quantum meruit, quasi-contract, negotiorum gestio, and/or estoppel." A certified-mail demand letter and billing statement were attached to the petition, with a prayer for attorney fees under Revised Statute § 9:2781.

PERSONAL JURISDICTION
The first issue raised on appeal is this state's exercise of jurisdiction over the nonresident defendants. Both Colonial Oil and Colonial Marine contend that the trial court erred in overruling their exceptions to the exercise of personal jurisdiction. Colonial Oil asserts it has had no contacts with this state, and Colonial Marine argues that its only contacts were through occasional representation of owners of ships that call on Louisiana ports. While admitting that Colonial Gulfship did business in the state, both defendants deny that there was any disregard of corporate formalities such that those contacts would justify Louisiana's exercise of jurisdiction. Francis Brown of Colonial Oil and Scott Ransom of Colonial Marine executed affidavits to that effect, which were submitted in support of the exceptions. The defendants argue that the due process requirements for suit in this state have not been met as to either Colonial Oil or Colonial Marine.
Mr. Salley points out, however, that the defendants' arguments are valid only if, as they claim, neither was involved in his hiring. He argues that Mr. Nash's testimony, both by affidavit submitted in opposition to the exceptions and at trial, establish that Colonial Marine retained him, a Louisiana attorney, with full knowledge that the work would be performed here. Consequently, specific jurisdiction exists because this suit arises out of that conduct. Mr. Salley further contends that the related corporations failed to maintain any operational distinctions and ignored corporate formalities, so that the actions of the subsidiaries, Colonial Marine and Colonial Gulfship, are imputed to the parent, Colonial Oil, for jurisdictional purposes.
Because, as explained below, we find that Colonial Oil is not liable to Mr. Salley, its jurisdictional challenge is moot. Therefore, we address only the exercise of personal jurisdiction over Colonial Marine Industries, Inc.
The Due Process Clause of the U.S. Constitution prohibits a state's exercise of personal jurisdiction over a nonresident defendant unless the defendant's contacts with the state are "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." deReyes v. *1249 Marine Management & Consulting, 586 So.2d 103, 105 (La.1991), citing International Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). The determination that due process standards are met requires a two-part analysis of minimum contacts and the factors relevant to the fairness of litigation within that forum. deReyes, 586 So.2d at 106; Zivalich v. International Brotherhood of Teamsters, 95-0169, pp. 2-3 (La.App. 4th Cir. 9/28/95), 662 So.2d 62, 64, writ denied, 95-2618 (La. 1/5/96), 666 So.2d 292. It is generally held that those nonresidents who enter into interstate contracts with a forum state's citizens subject themselves to the specific jurisdiction of that state in a suit arising from the contractual obligation. deReyes, 586 So.2d at 106; Bordelon, Hamlin, Theriot & Hardy v. Burlington Broadcasting, Ltd., 94-1839, p. 5 (La.App. 4th Cir. 3/16/95), 652 So.2d 1082, 1085, citing Burger King Corp. v. Rudzewicz, 471 U.S. 462, 473, 105 S.Ct. 2174, 2182, 85 L.Ed.2d 528 (1985); see also Fine v. Rubin, 617 So.2d 86 (La.App. 4th Cir.1993). If the defendant is thus found to have "purposefully established such minimum contacts with the forum state, a presumption arises that jurisdiction is reasonable and the burden of proof and persuasion shifts to the defendant" to show the factors of the fairness analysis weigh against the exercise of jurisdiction. deReyes, 586 So.2d at 106-07; Burlington Broadcasting, 94-1839 at pp. 5-6, 652 So.2d at 1085. On appeal, the trial court's determination on this issue is subject to de novo review. Zivalich, 95-0169 at p. 2, 662 So.2d at 64, citing Babcock & Wilcox Co. v. Babcock Mexico, 597 So.2d 110, 112 (La.App. 4th Cir.), writ denied, 600 So.2d 679 (La.1992).
In the present case, Colonial Marine's president contacted Mr. Nash, a Louisiana resident, and engaged him as an insurance claims consultant for a New Orleans office. In connection with this employment, Mr. Nash received his instructions during frequent phone contacts with Mr. Demere in Colonial Marine's Savannah office, and payments for both Mr. Nash's services and for claim settlements were issued by Colonial Marine. Mr. Demere came from Georgia to the New Orleans office to discuss certain problem areas discovered by Mr. Nash, and eventually it was decided that an attorney would be consulted on these issues. With Mr. Demere's approval, Mr. Nash retained a Louisiana attorney to research the potential liability that might be imposed on Colonial Oil and related corporations by virtue of the acquisition of an unrelated entity. In the course of that assignment, Mr. Salley gathered information through Mr. Nash's contacts with the Savannah office and elsewhere, and correspondence and facsimiles were sent to and from New Orleans. This litigation arose when Colonial Marine denied liability for Mr. Salley's fee for the services rendered in this state.
There are sufficient "minimal contacts" to allow a Louisiana court to exercise personal jurisdiction over Colonial Marine in connection with litigation relating to the legal services rendered by Fred Salley. Colonial Marine has not established that the weight of the burden to litigate here, less plaintiff's and this state's interest in this forum, outweighs the nature and extent of its contacts with Louisiana, as required to defeat jurisdiction. deReyes, 586 So.2d at 107. The trial court did not err in overruling the exception to personal jurisdiction.

DEFENDANTS' LIABILITY
While the parties stipulated that the amount of Mr. Salley's fee was reasonable, Colonial Oil and Colonial Marine contend that the trial court was clearly wrong to find either defendant corporation liable for payment. They note that all of Mr. Salley's correspondence as well as the ultimate work product, his opinion letter, was addressed to Mr. Nash at Colonial Gulfship. Because it was thus shown that Mr. Salley had been retained by Colonial Gulfship on behalf of Colonial ATL, the defendants assert that only those entities, not their parent and sister corporations, could be found responsible for payment. It is further argued that neither Mr. Nash nor his employing company, Colonial Gulfship, had any authorityactual or apparentto contract on behalf of Colonial Oil or Colonial Marine. Both defendants deny deriving any benefit from Mr. Salley's services.
*1250 We find that the evidence clearly establishes that Mr. Nash contracted with Mr. Salley for the legal services at issue, and that Mr. Demere ratified this action. The question presented is whether Colonial Marine was thus bound on that obligation.
An agency relationship may be created by express agreement under Civil Code article 2985 or, when necessary to protect innocent third parties, it may be implied to exist under the apparent authority granted by the principal. Independent Fire Ins. Co. v. Able Moving & Storage, Inc., 94-1982, p. 6 (La. 2/20/95), 650 So.2d 750, 752; Boulos v. Morrison, 503 So.2d 1, 3 (La.1987). Under the doctrine of apparent authority, an agency relationship may be formed even without the intent to do so. Anderson Window & Patio Co. v. Dumas, 560 So.2d 971, 975 (La.App. 4th Cir.1990). While a third party may not blindly rely upon an agent's assertions of authority, if the principal's words and conduct under the particular facts of the case give the third party the reasonable belief that an agent has the authority to act for the principal, an agency relationship will be implied. Boulos, 503 So.2d at 3. Such determinations of an agency relationship and the scope of authority are essentially factual, subject to the manifest error standard of review. Id. Thus, the appellate court will not disturb the decision below if credible evidence providing a reasonable factual basis for the trial court's conclusion was presented. Id. We find that the testimony and evidence in this case supports the conclusion that Mr. Salley was retained by Colonial Marine Industries, Inc., acting through John Demere.
Mr. Demere testified at trial that for some unspecified period of time he served as an officer of both Colonial Gulfship and Colonial Marine. However, there is no evidence indicating this fact was ever communicated to either Mr. Nash or Mr. Salley. Mr. Demere introduced himself to Mr. Nash as the President of Colonial Marine, and after Mr. Demere hired him, Mr. Nash was paid by Colonial Marine. All of Mr. Nash's correspondence to Mr. Demere, including that dealing with Gulfship Marine's handling of insurance claims, was addressed to Colonial Marine. Thus, even though Mr. Nash testified he worked "at" Colonial Gulfship, it was reasonable for him to believe he worked as a consultant "for" Colonial Marine.
Furthermore, on the evidence presented the trial court reasonably could infer that Colonial Gulfship, if it existed at all, was merely a shell corporation during the period of Mr. Salley's representation. Although Colonial Gulfship was intended to receive the assets of Gulfship Marine, the contradictory evidence concerning the date of that transaction, as well as the asserted "re-sale" to Mr. Mayeux less than five months later, suggests that Colonial Gulfship was devoid of any assets by which it could pay employees, agents or Mr. Salley. This, in turn, supports the conclusion that Colonial Marine retained Mr. Salley, rather than Colonial Gulfship, as defendants assert. We note that, although defendants' argument relies on the distinction between these related corporate entities, they presented no incorporation documents to rebut plaintiff's assertions that, in practice, no distinctions were made by the people involved.
The evidence also demonstrates that throughout the relevant period (July 1992 through September 1993), no effort was made to maintain or to clarify the distinctions between Gulfship Marine, Colonial Marine or Colonial Gulfship. Although Mr. Brown testified that Colonial Gulfship had been incorporated in July 1992, Colonial Marine's press release one month later stated that Colonial Gulfship was to be one of two "operating names" of a consortium owned by Colonial Oil and "represented" by both Colonial Gulfship and Colonial Marine. Significantly, John Demere acted on behalf of Colonial Marine, not Colonial Gulfship, in issuing this press release. Since Colonial Marine was a company that served as "managing agents and technical managers," it is reasonable to infer that, despite Colonial Gulfship's asserted status as a separate corporate entity, Colonial Marine was responsible for its management and control until the transaction with Mr. Mayeux was completed.
In addition to this lack of clarity in the organizational structure, it is clear that Mr. Salley was initially misinformed concerning *1251 the existing status of the Colonial-Mayeux transaction. Although he was challenged by defense counsel at trial for alleged ambiguity in his initial engagement letter, the evidence shows that Mr. Salley was led to believe that Colonial Oil had already acquired Gulfship Marine, which was now to be managed by Colonial Marine and renamed Colonial Gulfship. Not until he read Mr. Mayeux's December 8th memo, which explained that only an offer to purchase had been made, was Mr. Salley made aware of his mistake. Significantly, although Mr. Mayeux had recognized and attempted to correct Mr. Salley's factual error in the engagement letter, Mr. Demere made no similar effort to correct any misunderstanding nor even to clarify the ambiguity later asserted at trial.
Furthermore, Mr. Salley's testimony concerning the need for circumspection in his correspondence is corroborated by the fact that Mr. Mackey of Gulfship Marine had no forewarning that he was to be replaced by someone hired by John Demere.[9] This surprise at Mr. Nash's arrival in the New Orleans office supports the inference that the full nature of the proposed corporate transactions were not being divulged, even to those who would be most affected.
It is also clear from the evidence presented that until December 18, 1992, Mr. Salley, who got all of his information from Mr. Nash, was led to believe that "Colonial Gulfship" was merely a new name for Gulfship Marine, which by then he knew still belonged to Mr. Mayeux. Only after Mr. Demere's phone contact December 18th to correct the operative facts in the first draft opinion letter does Mr. Salley's correspondence reflect a distinction between the two entities: The final work product, as compared to the initial draft, has an additional paragraph that states that "[h]aving been advised that Colonial/Gulfship is a wholly new and separate entity from Gulfship Marine...." (emphasis added). It is thus apparent that although Mr. Demere had approved Mr. Nash's retention of counsel to investigate Colonial Oil's potential liability for Gulfship Marine's actions regarding stale cargo claims, the most basic facts of the transaction were not conveyed to Mr. Nash. Mr. Demere's failure to provide complete and accurate information to Mr. Nash led, in turn, to Mr. Salley's belief that he was retained by Colonial Marine.
Finally, we note that even when Mr. Demere, who by then was working at Associated Transport, received Mr. Salley's bill addressed to Colonial Marine, he did not inform Mr. Salley of the asserted mistake or re-direct the invoice to Colonial Gulfship. His response instead was to instruct Mr. Nash to negotiate a reduction in the amount, even though the insurers had agreed to pay one-half of the fee. Despite two follow-up letters, it was not until October 1993 that Colonial Marine asserted that Mr. Salley had not been retained by that entity.
On this evidence, it is reasonable to conclude that Colonial Marine, acting through John Demere, not only clothed Mr. Nash with the authority to retain Mr. Salley, but also to issue believable assurances that the client was Colonial Marine rather than any of the other entities involved. Because the defendant created a situation ripe for confusion and then failed to clarify the facts when the misunderstandings became apparent, we cannot say the trial court's finding that Colonial Marine Industries, Inc. is liable for Mr. Salley's fee is manifestly erroneous. See, e.g., Anderson Window & Patio Co., 560 So.2d at 976. On this evidence, it was reasonable to conclude that Mr. Demere acted on behalf of Colonial Marine when he instructed Mr. Nash to consult an attorney and when he ratified Mr. Nash's retention of Mr. Salley.
In contrast, we find no basis in the record for the trial court's finding that Colonial Oil is liable to Mr. Salley. Although he concedes that Colonial Oil has no contractual liability, Mr. Salley argues that the judgment against it should be affirmed based upon the theory of quantum meruit. In this regard, it is apparent that he is using the common law term for the equitable doctrine that is recognized in Louisiana's civilian jurisprudence as the actio de in rem verso, or *1252 unjust enrichment.[10]See Baker v. Maclay Properties Co., 94-1529, pp. 16-18 (La. 1/17/95), 648 So.2d 888, 896-97, and cases cited therein. There are five requirements to establish unjust enrichment: (1) an enrichment, (2) an impoverishment, (3) a connection between the enrichment and the impoverishment, (4) an absence of justification for the enrichment and impoverishment, and (5) the lack of another available remedy to the plaintiff. Baker, 94-1529 at 18, 648 So.2d at 897, and cases cited therein.
Although Colonial Oil arguably derived the benefit of his work, it is not liable to Mr. Salley under the doctrine of unjust enrichment because we have affirmed the award against Colonial Marine. He cannot therefore show either an impoverishment or a lack of another remedy.
For these reasons, we affirm the finding of liability as to Colonial Marine Industries, Inc. but reverse the judgment of liability against Colonial Oil Industries, Inc.

ATTORNEY FEES ON OPEN ACCOUNT
Mr. Salley contends that since the trial court awarded the invoiced amount, it was error to reject his claim against Colonial Marine for attorney fees under the open account statute.[11] He points out that the amount of the unpaid invoice was stipulated as reasonable, and that there was no dispute concerning the quality of the legal services rendered. He argues, therefore, that the stipulated amount of $4,606.21 in costs and attorney fees is due through trial, as well as a reasonable sum for appellate attorney fees, under La. Revised Statute § 9:2781. The defendants counter that Mr. Salley did not prove an "open account relationship" as required for recovery under the statute.[12]
We find that Mr. Salley is entitled to recover attorney fees for prosecution of this claim under La. Revised Statute § 9:2781 A which states:
A. When any person fails to pay an open account within fifteen days after receipt of written demand therefor correctly setting forth the amount owed, that person shall be liable to the claimant for reasonable attorney fees for the prosecution and collection of such claim when judgment on the claim is rendered in favor of the claimant....
It has been conceded that Mr. Salley fully complied with the technical requirements of this statute, and this court has affirmed the award in his favor for the amount set forth in his demand letter. Although Mr. Salley rendered the opinion for which he was originally retained in December 1992, he continued to advise Mr. Nash concerning other issues as they arose, with Mr. Demere's acquiescence if not express approval. As late as March 22, 1993, Colonial Marine was advised of, and expressed no objection to, Mr. Nash's open account arrangement with Mr. Salley. This evidence thus establishes that the parties had established an ongoing relationship with an extension of credit to the debtor, as required for recovery under the statute. See Acme Window Cleaners v. Natal Construction Co., 95-0448, pp. 3-4 (La.App. 4th Cir. 8/23/95), 660 So.2d 926, 927-28, and cases cited therein. Accordingly, Mr. Salley is entitled to recover attorney fees for his prosecution of this suit to collect the amount due.

CONCLUSION
For the reasons assigned, we reverse the judgment against Colonial Oil Industries, Inc. but affirm the judgment against Colonial Marine Industries, Inc. The judgment denying Mr. Salley's claim under Revised Statute § 9:2781 is reversed, and he is awarded the additional sum of $4,606.21 as well as attorney *1253 fees on appeal in the amount of $1000.00. All costs of this appeal are to be borne by Colonial Marine Industries, Inc.
AFFIRMED IN PART, REVERSED IN PART AND RENDERED.
WALTZER, J., concurs in the result.
NOTES
[1] Mr. Nash had retired as head of the Risk Management Division of Lykes Brothers Steamship at the end of June 1992 after more than thirty-four years dealing with maritime insurance claims.
[2] Mr. Nash and Mr. Demere did not actually meet until September 1992 when a meeting was held at the Trade Mart office to discuss ongoing cargo litigation with the attorney handling those cases.
[3] The claims at issue were cargo claims against Antilles Lloyd, Ltd., a Cayman corporation for whom Gulfship Marine had acted as General Agent. The agency relationship was terminated effective December 31, 1990. Mr. Mayeux formed Antilles Lloyd (Bermuda), Ltd., and bought the trade name of Antilles Lloyd effective January 1, 1991. Antilles Bermuda then appointed Gulfship Marine as its General Agent and General Manager. Although Mr. Mayeux specifically disavowed the purchase or assumption of any of Antilles Lloyd's liabilities, Mr. Nash learned that Gulfship Marine had handled Antilles Lloyd's cargo claims long after the agency agreement ended.
[4] Ten or so of the claims were being litigated by the U.S. Department of Agriculture and/or the Justice Department.
[5] The significance of this memo will be discussed below.
[6] Mr. Salley's itemized statement of services rendered is consistent with the testimony concerning these conferences. The statement reflects issuance of a draft opinion to Mr. Nash on Dec. 15, to Mr. Demere on Dec. 21, and to both on Dec. 23 and Dec. 24, 1992.
[7] Mr. Demere had been transferred to Associated Transport Lines, Inc., another Colonial Oil subsidiary, effective May 1, 1993.
[8] Both of these letters from Nash to Demere were offered into evidence; defendants had no objection to the first but objected to the second letter, asserting it was hearsay evidence. The trial court took the issue under advisement but never ruled on the admissibility of the second letter. We find no error in the admission of either letter; Mr. Nash testified without objection concerning their contents and the circumstances prompting him to write them prior to any offer into evidence.
[9] Ken Nash testified that when he first arrived at the "Colonial Gulfship" office, Mr. Mackey immediately phoned Mr. Mayeux in Houston, who then informed Mr. Mackey that he was being replaced by Mr. Nash.
[10] This doctrine is now codified in Civil Code article 2298, effective January 1, 1996.
[11] Mr. Salley conceded that because Colonial Oil was not contractually liable for the invoiced services, he could not recover from this defendant under the open account statute.
[12] Defendants also assert that since there was no trial court finding that a contract existed and the claim for attorney fees was rejected, it must be assumed that the judgment was based upon quasi-contract or unjust enrichment, precluding any award under the open account statute. However, since we have found that Colonial Marine Industries, Inc. is contractually liable to Mr. Salley for the services rendered and billed, we must render a judgment that "is just, legal, and proper upon the record," without regard to any asserted assumption. La.Code Civ. Proc. Ann. art. 2164.