931 So.2d 1129 (2006)
QUILIO & ASSOCIATES, INC.
v.
PLAQUEMINES PARISH GOVERNMENT.
No. 2005-CA-0803.
Court of Appeal of Louisiana, Fourth Circuit.
May 10, 2006.
*1131 Raymond G. Hoffman, Jr., Bryan D. Haggerty, Hoffman & Haggerty, L.L.C., Metairie, Counsel for Plaintiff/Appellant.
Michael L. Mullin, Assistant Parish Attorney, Plaquemines Parish Government, Belle Chasse, Counsel for Defendant/Appellee.
(Court composed of Judge TERRI F. LOVE, Judge MAX N. TOBIAS Jr., Judge EDWIN A. LOMBARD).
TERRI F. LOVE, Judge.
This litigation arises from consulting work performed by Quilio & Associates, Inc. for the Plaquemines Parish Government, after the Plaquemines Parish Council refused to renew Mr. Quilio's yearly contract in June of 1992. The Plaquemines Parish President, Luke Petrovich, entered into further consulting contracts with Mr. Quilio, including a contingency fee contract in connection with litigation between Plaquemines Parish Government and Tennessee Gas Pipeline Company. After the litigation settled, Mr. Quilio sought payment based on the contract. The trial court held that Mr. Quilio was not entitled to compensation under the contract because: 1) Luke Petrovich did not have actual authority to enter into contract with Mr. Quilio without the Plaquemines Parish Council's approval; 2) Luke Petrovich did not possess apparent authority to enter into the contract; 3) the Council did not ratify the contract by settling the litigation; and 4) the doctrine of unjust enrichment did not apply due to Mr. Quilio's own fault. We affirm.

FACTUAL BACKGROUND AND PROCEDURAL HISTORY
Joe Quilio ("Mr. Quilio"), president and sole owner of Quilio & Associates, Inc., began consultant work for the Plaquemines Parish Government ("Parish") in 1985 by auditing oil and gas production on Parish owned lands. The Parish, through Parish President Luke Petrovich ("Mr. Petrovich"), retained Mr. Quilio on a yearly contractual basis and paid him by the hour for his consulting services. During his work with the Parish, Mr. Quilio began auditing mineral leases with Tennessee Gas Pipeline Company ("Tenneco"). Mr. Quilio discovered that Tenneco had been repeatedly underpaying the Parish for mineral leases on Parish owned lands.
The Parish continually renewed Mr. Quilio's contract until June of 1992. In 1992, the Plaquemines Parish Council ("Council") unanimously refused to renew Mr. Quilio's contract. However, Mr. Quilio continued to work on the Tenneco matter. In 1993, Mr. Quilio urged Mr. Petrovich to continue seeking money owed from Tenneco. Mr. Petrovich retained Sal Anzelmo ("Mr. Anzelmo") as his special counsel to *1132 investigate whether he had the authority to enter into contracts with Mr. Quilio without the Council's approval. Mr. Anzelmo, as special counsel to Mr. Petrovich and not in representation of the Council or Mr. Quilio, stated that he believed Mr. Petrovich did have the authority to enter into a new contract with Mr. Quilio pursuant to the Parish Charter. Mr. Petrovich and Mr. Quilio then met with the law firm of Brook, Morial, Cassibry, Pizza & Adcock ("Brook firm") to discuss the possibility of pursuing litigation against Tenneco. The Brook firm was also retained as special counsel and advised Mr. Petrovich that Mr. Quilio should be hired to work on the auditing for the future Tenneco litigation. However, the Brook firm expressed concerns about Mr. Petrovich's authority to enter into the contract.
On January 7, 1994, Mr. Quilio entered into a contingency fee contract ("Contract") with Mr. Petrovich, as Parish President and acting on behalf of the Parish, to retain Mr. Quilio for work on the Tenneco litigation. The Contract stated that Mr. Quilio was entitled to ten percent of the first $2,000,000.00 of recovery and twelve and a half percent of any recovery over $2,000,000.00. Tenneco agreed to settle with the Parish and the Council authorized Mr. Petrovich to sign the settlement, dated October 13, 1994. Tenneco agreed to pay the Parish $3,215,523.00 in cash and spend $4,000,000.00 for future expenditures in the Bastian Bay field development. The Parish refused to pay Mr. Quilio's demand of $851,940.00, based upon the total settlement recovery of $7,215,523.00, predicated on the invalidity of the contract. The Parish paid the Brook firm for their services in connection with the Tenneco litigation in 1995.
In 1996, Mr. Quilio filed suit seeking specific performance, a declaratory judgment, and damages. The Parish, through the Council, filed a motion for summary judgment. The trial court denied the motion and the matter proceeded to trial. The trial court held that Mr. Quilio was not entitled to compensation based on the Contract. The trial court reasoned that Mr. Petrovich lacked the actual or apparent authority to enter into the Contract, the Council did not ratify the Contract by accepting the Tenneco settlement, and the doctrine of unjust enrichment did not apply to the facts in the case, sub judice. Mr. Quilio's devolutive appeal timely followed.
Mr. Quilio asserts that the trial court erred by finding that: 1) Mr. Petrovich did not have actual authority to bind the Plaquemines Parish Government to the Contract; 2) Mr. Petrovich did not have apparent authority to bind Plaquemines Parish Government to the Contract; 3) the Parish Council did not ratify the Contract by accepting the settlement with Tenneco; and 4) Mr. Quilio was not entitled to compensation under the doctrine of unjust enrichment.

STANDARD OF REVIEW
Appellate courts review factual findings of the trial court using the "manifest error" or "clearly wrong" standard. Rosell v. ESCO, 549 So.2d 840, 844 (La. 1989). The Louisiana Supreme Court developed a bifurcated test for reviewing and reversing factfinder's determinations that requires: 1) the reviewing court must find that the trial court's findings have no reasonable factual basis and 2) the record shows that the findings are wrong (manifestly erroneous). Mart v. Hill, 505 So.2d 1120, 1127 (La.1987). The reviewing court must view the record in its totality to determine if the factfinder was clearly wrong and if the decision was reasonable. Stobart v. State, Through Dept. of Transp. and Dev., 617 So.2d 880, 882 (La.1993). *1133 This rationale stems from the fact that the trial court has "better capacity to evaluate live witnesses." Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973). "[W]here two permissible views of the evidence exist, the factfinder's choice between them cannot be manifestly erroneous or clearly wrong." Stobart, 617 So.2d at 883.

ACTUAL AUTHORITY
The laws or rules governing a political office grant actual authority. The Charter of the Parish of Plaquemines ("Charter") governs the duties, roles, powers, and qualifications of the Parish President and the Council. The Charter provides, in pertinent part:
Section 3.01: Powers of the President
The Parish President shall be the Chief Executive officer of the Parish and shall have power, subject to this Charter and the Constitution of the State, to supervise and direct all activities and functions of Parish Government and provide administrative and logistical support to all other political subdivisions and districts therein as provided in this Charter and may delegate such authority to the offices and agencies of the Parish as hereinafter provided.
The Charter also details the duties of the President. It states, in pertinent part:
Section 3.10: Duties of the President
The Parish President shall have the following duties:
A. Carry out policies adopted by the Parish Council;
B. Exercise general oversight of the activities of boards, agencies, and special districts;
C. Exercise supervision over all other executive and administrative work of the Parish and provide for the coordination of administrative activities;
D. Assure the provisions of the Charter, the Ordinances of the Parish and all laws are enforced;
...
H. Submit annually to the Council for its consideration and approval an operating budget and a capital improvement budget;
The powers outlined above do not specifically grant the Parish President the power to enter into contracts regarding Parish owned lands without the approval of the Council.
Article Four of the Charter delineates the powers of the Council. The Article reads, in pertinent part:
Section 4.01: Legislative Powers
A. All legislative powers of the Parish of Plaquemines shall be vested in the Parish Council and exercised by it, subject to any applicable provisions of this Charter, and shall include, but not be limited to, the power to:
(1) Represent, as governing authority, the Parish of Plaquemines and all political subdivisions and districts therein, in any and all matters and actions, all rights of action and warranties, and all rights, title, and interest in and to all lands and property owned by them, and to all resources and revenues derived therefrom.
...
(25) Provide for the employment of any employee and personnel which, in its judgment, may be necessary and proper to perform the work and carry out the duties and functions of Parish government and the conduct and operation of the other political subdivisions and districts situated within the Parish.
(26) Have the exclusive authority to provide for the compensation and the terms and conditions of employment under which all of its employees shall be employed *1134 and work for the Parish of Plaquemines and all other political subdivisions and districts therein.
The legislative powers reserved for the Council include any actions concerning interests in Parish owned lands. This would include the Tenneco litigation regarding mineral leases on Parish owned land. The Charter also reserves the power of employing people to work for the Parish and the "exclusive authority" of determining the compensation of the employees.
Additionally, the Charter also describes how debts may be incurred. It states, in pertinent part:
Section 7.06: Administration of Operating and Capital Budgets
A. No payment shall be made or obligation incurred against any allotment or appropriation except: (a) in accordance with the approved operating and capital budgets and appropriations duly made and (b) unless the President first certifies that there is a sufficient unencumbered balance in such allotment or appropriation and that sufficient funds therefrom are or will be available to cover the claim or meet the obligation when it becomes due and payable. However, this provision shall not limit the authority of the Council to borrow funds in anticipation of revenue as provided in the general laws of the State. Any authorization of payment or incurring of obligation in violation of the provisions of this Charter shall be void and any payment so made illegal; such action shall be cause for removal of any official, officer or employee who knowingly authorized or made such payment or incurred such obligation or who caused such payment to be authorized or made or obligation to be incurred. Such person shall also be personally liable for reimbursement, with interest, to the Parish Government of any amount so paid.
B. Nothing in this Charter shall be construed so as to prevent the making or authorizing of payments or making of contracts for capital improvements to be financed wholly or partly by the issuance [sic] of bonds or to prevent the making of any contract or lease providing for payments beyond the end of the fiscal year, provided that such action is authorized by Ordinance, except that contracts for services not covered by the public bid law (R.S. 38:2181, et seq., as amended) shall not be for a period in excess of two (2) years.
The Parish Charter states that all obligations must be included in the "operating and capital budget." Mr. Petrovich did not submit the Contract with Mr. Quilio to the Council, nor did he include the obligation in the budget. Mr. Quilio asserts that the recovery from the Tenneco settlement should be considered a sufficiently "unencumbered balance" to justify Mr. Petrovich's lack of Council approval. However, the record is devoid of evidence that demonstrates that Mr. Petrovich first certified that the Tenneco recovery would be a sufficiently unencumbered balance to pay Mr. Quilio, prior to signing the Contract.
Mr. Petrovich stated that he did not include the Contract in the Council's agenda because he did not think it would pass. Additionally, Mr. Petrovich and Mr. Anzelmo never consulted with the Council's attorney regarding Mr. Petrovich's authority to execute the Contract because the Council attorney would "report to the council" and, in Mr. Petrovich's opinion, destroy the Parish's position with Tenneco. Mr. Quilio testified that Mr. Petrovich stated that he did not discuss the Contract with the Council because of the adversarial relationship between the Council and Mr. Petrovich. Mr. Quilio also testified that *1135 Mr. Petrovich told him that the Council would not approve any further contracts with Mr. Quilio. Then, Mr. Quilio testified that Mr. Petrovich said they would have to find "some other form, some alternate source," to compensate Mr. Quilio for future work on the Tenneco matter.
In his deposition, Mr. Anzelmo, working as Mr. Petrovich's special counsel and not as the Parish or Council's attorney, relied upon Section 5.02 of the Charter to justify Mr. Petrovich's actual authority to enter into the Contract with Mr. Quilio. That section states, in pertinent part:
Section 5.02: Legal Services
B. The Parish President shall also have the power and authority to employ attorneys, with the approval of the Parish Council, to handle all legal and financial work with reference to the issuance of bonds, notes, or other evidences of indebtedness, whether in the original instance, or for refunding purposes. In other matters as the Parish President may deem advisable, the Parish President may employ special counsel pursuant to the provisions of this Charter. In all cases, the Parish shall compensate said special counsel for their services.
However, this section of the Charter only refers to employing and compensating special counsel; therefore, Mr. Petrovich had the authority to hire Mr. Anzelmo and the Brook firm as his attorneys, but not the authority to hire and compensate consultants without the Council's approval.
After reviewing the Charter, we find that Mr. Petrovich lacked actual authority to enter into the Contract with Mr. Quilio. Actions regarding rights and interests in Parish owned lands are specifically reserved as powers of the Council. Also, the power to employ and compensate people for work necessary to "carry out the duties and functions" of the Parish specifically lies with the Council. Mr. Petrovich never included the Contract in a budget proposal or submitted it to the Council. Thus, Mr. Petrovich did not have the authority to enter into the Contract with Mr. Quilio. Therefore, we find that the trial court did not commit manifest error, nor was clearly wrong by finding that Mr. Petrovich lacked actual authority to enter into the Contract with Mr. Quilio.

APPARENT AUTHORITY
Apparent authority was jurisprudentially created to protect third parties from "unauthorized acts of an apparent agent." Boulos v. Morrison, 503 So.2d 1, 3 (La.1987). "An agent is one who acts for or in the place of another by authority from the latter." Anderson Window & Patio Co. v. Dumas, 560 So.2d 971, 975 (La.App. 4 Cir.1990). For apparent authority to apply, Louisiana law requires two elements: 1) that the "principal must first act to manifest the alleged agent's authority to an innocent third party;" and 2) that the "third party must rely reasonably on the manifested authority of the agent." Boulos, 503 So.2d at 3. The third party also has a "duty to inquire into the nature and extent of the agent's power." Id. After conducting an inquiry, the third party must have a "reasonable belief," based on the facts of the case, that the agent has authority. Salley v. Colonial Marine Indus., Inc., 95-2215 (La. App. 4 Cir. 09/11/96), 680 So.2d 1242, 1250. "The burden of proving apparent authority is on the party relying on the mandate." Boulos, 503 So.2d at 3, citing Bamber Contractors, Inc. v. Morrison Eng'g & Contracting Co., 385 So.2d 327, 330 (La.App. 1 Cir.1980).
The first element of apparent authority requires that the third party be "innocent." Mr. Quilio asserts that he relied upon the statements of Mr. Anzelmo as the Parish attorney. However, Mr. Anzlemo *1136 was retained as Mr. Petrovich's special counsel and not as the Parish or Council attorney. Additionally, Mr. Quilio knew that the Council refused to renew his yearly contract beginning in 1992, yet he continued to work on the Tenneco matter. Mr. Quilio testified that he knew the Council would be unlikely to rehire anyone who worked with Mr. Petrovich. Mr. Quilio also testified he knew that the Council never approved any contracts with him after 1991. Mr. Quilio admitted that he suggested the contingency fee contract after he discovered that the Council would not approve any further contracts with him. He and Mr. Petrovich also met with an attorney from the Brook firm to discuss the Contract and the firm never advised either Mr. Quilio or Mr. Petrovich that Mr. Petrovich had the authority to enter into the Contract. However, the Brook firm had concerns about Mr. Petrovich's authority to enter into the Contract.
Mr. Petrovich and Mr. Quilio then met with Mr. Anzelmo three times to discuss the validity of the Contract. Mr. Anzelmo, as Mr. Petrovich's special counsel, stated that he did not want them to ask him any further questions about the Contract because, based on his interpretation of the Charter, he believed that Mr. Petrovich had the authority to sign the Contract. Mr. Quilio could not rely on Mr. Anzelmo's statements because he was not the Parish's or Council's attorney. Additionally, Mr. Anzelmo did not represent Mr. Quilio and Mr. Quilio never hired his own attorney. Mr. Quilio took no independent steps to verify Mr. Petrovich's apparent authority.
After reviewing the facts in the record, we cannot find that Mr. Quilio was an innocent third party as required by the doctrine of apparent authority. He knew that the Council was required to approve his previous yearly contracts from 1985 to 1992. Mr. Quilio knew the Council did not want to approve any new contracts with him beginning in 1992. The facts also show that he knew a legal issue existed regarding Mr. Petrovich's authority to sign the Contract because they consulted attorneys four times regarding the Contract. Mr. Quilio also admitted that Mr. Petrovich never discussed the Contract with the Council. Thus, he was not an innocent third party. Therefore, we find that the trial court was not manifestly erroneous or clearly wrong when it held that Mr. Quilio could not recover under the doctrine of apparent authority.

RATIFICATION
Ratification occurs when someone consents to an "obligation incurred on his behalf by another without authority" and it may occur expressly or tacitly. La. C.C. art. 1843.[1] Ratification occurs when the facts "indicate a clear and absolute intent to ratify the act, and no intent will be inferred when the alleged ratification can be explained otherwise." Bamber Contractors, Inc. v. Morrison Eng'g & Contracting Co., 385 So.2d 327, 331 (La. App. 1 Cir.1980), citing Nationwide Fin. Co. of Gretna, Inc. v. Pitre, 243 So.2d 326, 328 (La.App. 4 Cir.1971). The person who allegedly ratified the act must be "apprised of the facts" and have "full knowledge" *1137 of the act. Sunray Servs., Inc. v. City of Minden, 29,260, p. 5 (La.App. 2 Cir. 02/28/97), 690 So.2d 970, 973. The party asserting ratification bears the burden of proof. Bamber, 385 So.2d at 331.
Mr. Quilio was present at the settlement meetings with Mr. Petrovich and Tenneco. Mr. Quilio testified that Mr. Petrovich only told the Council that attorney's fees and consultant fees had to be paid in conjunction with accepting Tenneco's settlement agreement. Benny Rouselle, a Council member from 1987-1994, testified that Mr. Petrovich never formally or informally discussed the Contract with the Council. Mr. Petrovich stated in his deposition that he could not recall if he ever mentioned the Contract to the Council or if he ever included it in an agenda. Mr. Petrovich further stated that he never told the Council that Mr. Quilio was the consultant referred to in conjunction with the Tenneco settlement. He only mentioned that attorney's fees and consultant fees needed to be paid, but not to whom or how much.
After reviewing the testimony, we cannot find that the trial court committed manifest error or was clearly wrong when it found that the Council did not ratify the Contract by accepting Tenneco's settlement agreement. The record shows that the Council was not fully apprised of all the facts. The Council also lacked full knowledge of who the consultant was or how much the Parish owed him. Mr. Petrovich knew the Council did not desire to further employ Mr. Quilio. Additionally, the trial court made a credibility determination regarding Mr. Petrovich's truthfulness and understanding of whether the Contract had to be approved by the Council. Mr. Petrovich repeatedly stated that he could not recall facts when specifically questioned about the Council's knowledge of the Contract. Thus, the trial court concluded that the Council was not "fully apprised" of the facts and was denied "full knowledge" sufficient to satisfy the requirements for ratification.

UNJUST ENRICHMENT
The Louisiana Civil Code's doctrine of unjust enrichment provides a remedy for people who have enriched someone without just compensation. La. C.C. art. 2298.[2] To recover, the claimant must prove: 1) enrichment of the defendant; 2) impoverishment of the plaintiff; 3) a connection between the enrichment and the impoverishment; 4) no justification for the alleged unjust enrichment; and 5) the lack of any other remedy at law. Minyard v. Curtis Prods., Inc., 251 La. 624, 205 So.2d 422, 432 (1967). However, the plaintiff's impoverishment cannot be a result of his "own fault or negligence." Gray v. McCormick, 94-1282 (La.App. 3 Cir. 10/18/95), 663 So.2d 480, 487.
Unjust enrichment cannot be due to the fault or negligence of the plaintiff. The record shows Mr. Quilio to be partially at fault for not entering into a legally binding contract. He knew the Council did not wish to employ him past June of 1992. Mr. Quilio also stated that he knew the Council had to approve his yearly contracts. Mr. Quilio testified that he was aware that the Council was unanimously opposed to renewing his contract. Mr. Petrovich did not assure Mr. Quilio, after *1138 the Council refused to approve the 1992 yearly contract, that he would be compensated for work that he was proposing to conduct on the Tenneco matter. Mr. Quilio also testified that Mr. Petrovich did not discuss the Contract with the Council because of their adversarial relationship. Thus, we find the trial court did not commit manifest error or was clearly wrong by holding that unjust enrichment did not apply to Mr. Quilio.

DECREE
We find that the trial court did not commit manifest error, nor was it clearly wrong in its findings that Mr. Petrovich did not possess the actual authority to enter into the contract with Mr. Quilio, that Mr. Petrovich did not possess apparent authority, that the Council never ratified the contract, and that Mr. Quilio was not entitled to compensation under the doctrine of unjust enrichment.
AFFIRMED.
NOTES
[1] La. C.C. art. 1843: Ratification

Ratification is a declaration whereby a person gives his consent to an obligation incurred on his behalf by another without authority.
An express act of ratification must evidence the intention to be bound by the ratified obligation.
Tacit ratification results when a person, with knowledge of an obligation incurred on his behalf by another, accepts the benefit of that obligation.
[2] La. C.C. art. 2298: Enrichment without cause; compensation reads, in pertinent part:

A person who has been enriched without cause at the expense of another person is bound to compensate that person. The term "without cause" is used in this context to exclude cases in which enrichment results from a valid juridical act or the law. The remedy declared here is subsidiary and shall not be available if the law provides another remedy for the impoverishment or declares a contrary rule.