721 So.2d 853 (1998)
DUAL DRILLING COMPANY
v.
MILLS EQUIPMENT INVESTMENTS, INC., Travis Vollmering, Atlas Iron and Metal Company, Doyle Henderson, and Southern Scrap of Morgan City, Inc.
Nos. 98-C-0343, 98-C-0356.
Supreme Court of Louisiana.
December 1, 1998.
*854 Jack Marie Alltmont, Raymond Peter Ward, Sessions & Fishman, New Orleans; Dale Patrick Martin, Lippman, Mahfouz & Martin, Morgan City, for Applicant in No. 98-C-0343.
Charles Munson Lanier, Jr., Michael Mossy Christovich, Patricia Broussard Judice, George Alexander Weller, Joseph T. Puhekker, George Febiger Riess, New Orleans, Darrell Warren Ashy, for Respondent in No. 98-C-0343.
Darrell Warren Ashy, Joseph T. Puhekker, George Febiger Riess, New Orleans, for Applicant in 98-C-0356.
Jack Marie Alltmont, Raymond Peter Ward, Sessions & Fishman, New Orleans; Dale Patrick Martin, Lippman, Mahfouz & Martin, Morgan City; Charles Munson Lanier, Jr., Michael Mossy Christovich, Patricia Broussard Judice, George Alexander Weller, New Orleans, for Respondent in No. 98-C-0356.
TRAYLOR, Justice.[*]
We granted writs in this case to determine whether Louisiana law provides for a tort of conversion akin to that of the common law which imposes strict liability upon the tortfeasor. *855 Intertwined in this is the determination of whether the tortfeasors should be held liable jointly or otherwise.

FACTS AND PROCEDURAL HISTORY
On October 15, 1990, partners Travis Vollmering (Vollmering) and Atlas Iron and Metal Company (Atlas) agreed to purchase an inoperative off-shore oil rig (Rig 16) from Dual Drilling (Dual) located at the Tidex shipyard in Amelia, Louisiana. Rig 16 was comprised of three segments: an engine room, a cement room, and a pump room. The contract of sale established that Dual retained ownership of the quarters package, the derrick (complete with starting legs and storage baskets), and two National mud pumps. Vollmering reviewed the offer, blue prints of Rig 16, and inspected the rig prior to the purchase.
Subsequent to the sale, Atlas engaged Southern Scrap Recycling, Morgan City (Southern) to dismantle Rig 16 and sold the majority of the scrap metal to Southern. Southern memorialized the agreement, stating in pertinent part:
This will confirm our conversation between your representative Mr. Travis Vollmering and the writer with reference to the Dual rigs located at the Tidewater Yard in Amelia, La. It is mutually agreed and understood that you will be responsible for removing any large items from the rig. These items will include but not be limited to the following: cranes, mud pumps, derrick base, SCR unit and transformers, rotary skid, accumulator and choke manifold, generators and engines, P Tanks. Said items being referred to herein as "retention items." ...
Southern Scrap will assist you by furnishing burners to cut the retention items loose, however, Southern Scrap is not responsible for the condition of those items. The burners assigned to this task will be working under your supervision and it will be your responsibility to furnish whatever labor and equipment is necessary to remove and load the retention items ... All material left after the retention items are removed (I.E. "material to be scrapped") will become property of Southern Scrap and we will pay Atlas Iron and Metal $52.00 per gross (2240#) ton for this material... Southern Scrap will be responsible for cutting, loading, and transporting the material to be scrapped and shall furnish whatever personnel and equipment is necessary to accomplish this work ...
Vollmering visited the shipyard with a Southern employee and identified for him each item that was to be cut. He instructed the Southern employee where to begin cutting and mistakenly identified an adjacent rig component (Rig 25) as part of his property. Vollmering marked, "Do Not Cut" on what he deemed to be salvageable items. Prior to the commencement of this project, a Dual employee, James Monnin, marked "Do Not Cut" on three sides of Rig 25 with flourescent orange spray paint. In late February, 1991, as instructed by the partnership, Southern began cutting Rigs 16 and 25. A shipyard worker noticed Southern employees cutting Rig 25 and told them it was "not to be cut." Southern employees responded that he should not worry and should continue with his business.
On March 7, 1991, James Monnin and two other Dual employees, Khaled Farag and David Goodwill, visited the shipyard and found Rig 25 and the associated equipment missing. Two Southern employees told Farag that their supervisor, Mr. Hunter, ordered them to cut Rig 25 although it was marked, "Do Not Cut/Save XX."
At trial, Vollmering testified his impression from his dealings with Dual was that Rig 25 was part of Rig 16. He contended that the exclusion items named in the contract of sale were the only items excluded from the sale, and he prepared his bid based upon this belief. Vollmering and Southern's employees testified that all salvageable items were removed by Vollmering and that Southern never took possession of these items. The Southern employees testified that, because they did not know what a rig package was, they acted as instructed by Vollmering.
Khaleg Farag testified that the cost of the used converted rig structure and equipment was difficult to establish because there were not many used products on the market. The *856 lowest replacement values submitted by the plaintiff were: $213,811 for Rig 25, $64,296 for the swivel, $26,790 for the spinner, $4,428 for the kelley valve, and $26,518 for the pressure tank. These quotes were for a refurbished rig and new associated equipment valued at the time of the loss. James Monnin, who worked for Dual at the time of the conversion, valued Rig 25 at approximately 75% of "new" condition. Doyle Henderson of Atlas, a dealer in surplus oil rig equipment, testified that "rig condition" 500 ton swivels could be purchased for $9000 to $14,000, reconditioned spinners could be purchased for $3000, kelley valves could be purchased for $400, and pressure tanks could be purchased for between $5000 and $6000. He further testified that new B-44 model swivels could be purchased new for $8000. Henderson testified that in the depressed oil economy of 1991, the converted associated equipment was valued at about 50% of its value at the time of trial.
The trial court found that Dual was entitled to replacement cost of Rig 25 and associated equipment "less reasonable depreciation." The trial court rejected the lower values for the associated equipment, finding that Dual was entitled to replacement cost, and Defendants failed to show a basis for depreciation. The trial court further found that the Defendants offered no evidence of the value of the items before the loss. Thus, Plaintiff was awarded $213,811 to refurbish a used cement package building, and new associated equipment was valued at $26,518 for the P-tank, $64,296 for the 500 ton swivel, $26,790 for the kelley spinner, and $4,428 for the upper kelley valve. The trial court found that because Southern was advised orally and in writing that Rig 25 was "not to be cut," it knew or should have known that Defendants were not its owners. The trial court held Defendants solidarily liable for 100% of Plaintiff's loss. The court of appeal affirmed. 97-1010 (La.App. 4 Cir.); 705 So.2d 1246.

LAW AND ANALYSIS
The threshold issue before us is whether Louisiana law provides a strict liability remedy akin to the common law tort of conversion. We find that although conversion terminology has been borrowed from the common law, it is nonetheless securely rooted in civilian concepts of property law, offenses, and quasi-offenses. Our civilian remedies amply protect personal and real rights in movable property and should not be obscured by an application of common law conversion principles.

Principles of Civilian Conversion
The Civil Code itself does not identify causes of action for "conversion." However, causes of action for conversion have been inferred from the Codal articles providing that the right of ownership, possession, and enjoyment of movables are protected by actions for the recovery of the movables themselves, actions for restitution of their value, and actions for damages. La. Civ.Code arts. 511, 515, 521, 524, 526, and 2315. Consequently, the dispossessed owner of a corporeal movable may be accorded one of three actions to enforce his rights of ownership.
The first is the revendicatory action for the recovery of a movable transferred: 1) by the owner or legal possessor to a person in bad faith, 2) for less than fair value, or 3) when the movable was lost or stolen.[1] A.N. YIANNOPOULOS, LOUISIANA CIVIL LAW TREATISE §§ 350-51, at 680-83 (2nd ed. 1991 & Supp. 1998). The second action arises under the law of delictual obligations and exists under the theory of unjust enrichment.[2] YIANNOPOULOS, LOUISIANA CIVIL LAW TREATISE § 356, at 689-90. Because the property at issue is destroyed and no longer in the hands of the possessors, and because Plaintiff alleges a cause of action in tort rather than one for unjust enrichment, we pretermit discussion of the first two causes of action.
*857 The third action, relevant to the instant case, is known as a delictual action. It is available to an owner dispossessed as a result of an offense or quasi-offense or, in other words, a "tort." This action is grounded on the unlawful interference with the ownership or possession of a movable and is frequently termed an action for "conversion" in Louisiana. A conversion is committed when any of the following occurs: 1) possession is acquired in an unauthorized manner; 2) the chattel is removed from one place to another with the intent to exercise control over it; 3) possession of the chattel is transferred without authority; 4) possession is withheld from the owner or possessor; 5) the chattel is altered or destroyed; 6) the chattel is used improperly; or 7) ownership is asserted over the chattel. FRANK L. MARAIST & THOMAS C. GALLIGAN, LOUISIANA TORT LAW § 1-2, at 3 (1996 & Supp.1998); Importsales, Inc. v. Lindeman, 231 La. 663, 92 So.2d 574 (La.1957); see also Louisiana State Bar Assoc. v. Hinrichs, 486 So.2d 116 (La.1986). The conversion action is predicated on the fault of the defendant and directed to the recovery of the movable or, in the alternative, the plaintiff may demand compensation.[3]
Plaintiff herein alleged two separate acts of conversion: the first occurred when Rig 25 was dismantled, and second followed the disappearance of the associated equipment. Regarding the destruction of Rig 25, the record contains ample evidence that both Southern and the Partnership exercised dominion and control over Rig 25 which seriously interfered with Dual's property rights. It is evident that Vollmering exercised improper dominion over Rig 25 when he held himself and the Partnership out as its owner, ordered that it be demolished, and sold it as scrap metal. The Partnership asserted both dominion and a right of ownership over the rig which it did not legally possess. Likewise, Southern exercised improper dominion over Rig 25 when it carried out these orders in the face of a warning that Rig 25 was not to be cut. Furthermore, Southern should have realized Rig 25 was not part of the sale and was not to be dismantled upon seeing the flourescent orange "Do Not Cut" markings on the rig. The trial court found Southern knew or should have known that the rig belonged to someone other than the Partnership but failed to ascertain the identity of the true owner. Southern could have acted to prevent itself from destroying the wrong rig. Instead, precautions to find the owner were not taken.
The owner of a movable wrongfully converted and subsequently destroyed certainly has the right to recover the property's *858 value. The trial court properly determined that the Defendants were liable in solido[4] for the conversion of Rig 25. For these reasons, Southern and the Partnership must pay Dual for the full value of the rig at the time of the conversion. At any rate, because the trial court applied the principles of strict liability, it failed to assign a percentage of fault to each party for the conversion of Rig 25 as required by La. Civ.Code art. 2323. We remand this issue to the trial court so that fault may be properly assigned to the parties.
We now turn to the second issue of the converted associated equipment. It is noteworthy that evidence did not prove that the associated equipment was in Southern's possession or sold to Southern and disposed of by it at a subsequent time. In fact, all parties agreed that Southern never attained possession of the associated equipment. However, the evidence overwhelmingly indicated that the partnership had continuous possession of the equipment. Therefore, we find that the trial court committed manifest error in finding that Plaintiff carried its burden to prove that the missing associated equipment was converted by Southern. The trial court's ruling, which named Southern and the Partnership as solidary obligors, is reversed and 100% fault for the conversion of the associated equipment is assigned to the Partnership.

Measure of Damages
Because the rig and associated equipment is no longer in the possessors' hands, the Plaintiff will recover the value of the property at the time of the conversion. Quealy v. Paine, Webber, Jackson & Curtis, Inc., 475 So.2d 756, 762 (La.1985); Importsales, Inc. v. Lindeman, 231 La. 663, 92 So.2d 574, 575 (La.1957). We find no error in the trial court award of $213,811 for the refurbishment of an existing rig. However, regarding the associated equipment, we find that the trial court erred in awarding Plaintiff the full value of new equipment at the time of the conversion without any depreciation.
The Partnership, through its witness, Doyle Henderson, gave brief but uncontradicted testimony that the market for oil field equipment was depressed in 1991 and equipment of equal condition to that lost could be replaced at a fraction of the cost of new equipment. Henderson testified that in this depressed oil economy, the converted associated equipment was valued at about 50% of its value at the time of trial. We find that in order to make Plaintiff whole, the proper award for the converted equipment is not 100% of the cost of new, better equipment at the time of trial, but rather the cost of replacement of equipment equal to that lost. We find the award for 100% of the current value is manifestly erroneous and that there existed ample evidence that used equipment could have been purchased for a more reasonable amount. Based upon the testimony of witnesses for the Defense and for the Plaintiff regarding the valuation of this equipment, we set the fair value of the equipment at the time of the conversion as follows: $14,000 for the 500 ton swivel, $3000 for a reconditioned spinner, $400 for a kelley valve, and $6000 for a P-tank. These values are attained from evidence, duly admitted, regarding the highest values for used equipment. Therefore, we adjust the award for the converted associated equipment to $23,400.

CONCLUSION
After a thorough review of the record and considering the briefs submitted by the parties and oral argument, we find the court of appeal erred in affirming the trial court. We *859 vacate and set aside the judgment of the court of appeal.
We find the trial court committed manifest error in several instances. The trial courts' application of a common law doctrine of tortious conversion is flawed. The trial court erred when it found the Louisiana tort of conversion to be based upon strict liability. The Louisiana Civil Code, law of offenses and quasi offenses, and property law provide sufficiently for the loss incurred by Plaintiff, and therefore, Plaintiff's recovery is limited to that available to him under the laws of this state.
We find the Partnership and Southern are jointly liable under La. Civ.Code art. 2324 for the conversion of the rig. We further find that the actions of the Partnership alone resulted in the conversion of the associated equipment. Therefore, the Partnership is solely responsible for the conversion of the associated equipment. We reverse the award of damages for the associated equipment and find that Plaintiff is made whole with an award reflecting the value of the converted used equipment at the time of the conversion. Furthermore, we reverse the trial court's holding that Southern and the Partnership are solidarily liable for the conversion of the associated equipment. We remand this case to the trial court for findings consistent with this opinion and order the trial court to assign a tangible percentage of fault to each of the parties under La. Civ.Code art. 2323.

DECREE
REVERSED; REMANDED.
NOTES
[*] LEMMON, J., not on panel. See Rule IV, Part 2, § 3.
[1] The revendicatory action abates when the movable is no longer in possession of the defendant. However, the plaintiff may have a personal action for damages or unjust enrichment against the former possessor of the movable.
[2] A person unjustly enriched at the expense of another is under a quasi-contractual obligation to restore the corporeal movable to the rightful owner or account for the enrichment. This cause of action traditionally lies under the code articles for a payment not yet due.
[3] Despite the use of this common law term, such actions are not to be confused with the civil law tort of conversion. In common law jurisdictions, conversion is an intentional wrong giving rise to strict liability in an action for the recovery of the value of a chattel. A.N. YIANNOPOULOS, LOUISIANA CIVIL LAW TREATISE § 357, at 690-92. Prominent legal scholars agree that tortious activity is only established upon proof of fault under La. Civ. Code art. 2315 as opposed to the common law allowance of strict liability:

[T]he protection of proprietary interests in common law jurisdictions is substantially different from that accorded in civil law countries and in Louisiana. Everywhere the protection may be regarded as adequate and nearly complete.
A word of caution may be here appropriate: due to underlying fundamental differences in conceptual technique and methodology, borrowing of common law rules for the solution of problems arising under Louisiana law is both unnecessary and confusing. The legal profession in Louisiana should look for guidance in this area to its own legal tradition and to developments in civil law countries. Particularly with respect to movable property, it ought to be remembered that the common law has never provided a real action for the revendication of chattels, that the tort of conversion dominates this area of the law, and the absolute liability which characterizes conversion is in direct conflict with Article 2315 of the Louisiana Civil Code and the principle that liability for wrongful dispossession rests on fault. (Emphasis added, footnote deleted)
YIANNOPOULOS, LOUISIANA CIVIL LAW TREATISE § 359, at 695.
A useful distinction may be drawn between faults that are "blameworthy" and others that are not. In this dichotomy, intentional torts and negligence would be treated as blameworthy conduct, while vicarious liability, strict liability and absolute liability would be nonblameworthy conduct that nevertheless constituted "fault" under Article 2315. Intentional torts and negligence involve the actor's actual or constructive knowledge of a risk of harm to someone, a knowledge that makes the tortfeasor morally culpable or "blameworthy."
MARAIST & GALLIGAN, LOUISIANA TORT LAW § 1-2, at 3 (1996 & Supp.1998). (Footnotes omitted)
[4] In 1991, when this tort occurred, Civil Code Article 2324 regarding solidary liability provided in pertinent part:

A. He who causes another person to do an unlawful act, or assists or encourages in the commission of it, is answerable, in solido, with that person, for the damage caused by such act.
B. Persons whose concurring fault has caused injury, death or loss to another are also answerable, in solido; provided, however, when the amount of recovery has been reduced in accordance with the preceding Article, a judgment debtor shall not be liable for more than the degree of his fault to a judgment creditor to whom a greater degree of negligence has been attributed, reserving to all parties their respective rights of indemnity and contribution.
* * *