LEON A. CANNIZZARO, JR., Judge.
| jThis case involves an exclusive recording contract between Travis Lyons, doing business as II Fire Productions Co., and Derren Clouden, professionally known as Mr. Wicked. Mr. Lyons assigned the recording contract to II Fire Records, L.L.C. (“II Fire”). Mr. Clouden subsequently signed a recording contract with Forefront Entertainment L.L.C. (“Forefront”) in violation of his contract with II Fire. II Fire then sued Mr. Clouden, Forefront and Inner City Productions, L.L.C., an affiliate of Forefront (“Inner City”). The trial court granted a default judgment against Mr. Clouden for breach of contract, and that judgment has not been appealed. The trial court further granted judgment in favor of II Fire and against Forefront and Inner City, and Forefront and Inner City have appealed the judgment against them.
FACTS AND PROCEDURAL HISTORY
Default Judgment Against Mr. Clouden
Mr. Lyons and Mr. Clouden signed an Individual Recording Artist Agreement (the “II Fire Contract”)[1] pursuant to which Mr. Clouden was employed as a recording artist for the purpose of “making master recordings, from which |2phonograph records will be produced.” Mr. Clouden agreed in the II Fire Contract not to “perform for the purpose of making masters [sic] recordings or phonographs for any purpose or business entity other than Company [II Fire].” The exclusivity provision in the II Fire Contract bound Mr. Clouden not to compete for a five-year period after its termination or expiration. The term of the II Fire Contract was for an initial period of two years, and II Fire had the right to exercise up to three additional options to extend the contract for up to three additional one-year terms.
Under the II Fire Contract, Mr. Cloud-en agreed to record a minimum of one album during the first year of the II Fire Contract and to record a minimum of four side recordings during the second year of the II Fire Contract and during each option term of the II Fire Contract. According to the agreement, Mr. Clouden would receive a percentage of any royalties earned on his recordings, but first the costs and expenses incurred by II Fire in connection with the II Fire Contract would be deducted from the amount of the royalties to be paid to Mr. Clouden.
*1274 Prior to the trial against Forefront and Inner City, a default judgment was confirmed against Mr. Clouden, who had been served but failed to appear in any of the proceedings. Mr. Clouden was cast in judgment for $75,000.00. At the hearing on the confirmation of the default, Mr. Lyons testified that he was the chief executive officer of II Fire and that he was the director of a youth group, Central City Youth Against Violence. The II Fire Contract was introduced into evidence, and Mr. Lyons testified that the II Fire Contract was an exclusive recording contract.
Mr. Lyons further testified that Mr. Clouden did not have permission from II Fire to appear in the following videotape and compact disc (“CD”) recordings that were produced and distributed by Forefront and Inner City: (1) a videotape and an | .¡accompanying CD, both entitled “Ghetto Booty,” (2) a videotape and an accompanying CD, both entitled “Generation XXX,” (3) a CD entitled “Ghetto Booty 6,” (4) a CD entitled “Ghetto Booty 7,” (5) a videotape entitled “Southern Freaks 2000,” and (6) a CD entitled “Liquid City.” Each of these CDs and videotapes was introduced into evidence at the hearing on the confirmation of the default judgment.
Also introduced into evidence at the hearing were records of the expenditures that II Fire had made on behalf of Mr. Clouden in connection with the II Fire Contract. The expenditures totaled $49,672.87. Mr. Lyons testified that pursuant to the terms of the II Fire Contract, he expected that II Fire would recoup the expenditures from the royalties earned on the recordings that Mr. Clouden had agreed to make. Mr. Lyons further testified that II Fire had executed a contract with Formaldehyde Records (“Formaldehyde”) for the distribution of the recordings that were to be made by Mr. Clouden. Finally, Mr. Lyons stated that Mr. Cloud-en’s breach of the II Fire Contract caused II Fire to lose “at least about ... 200 to 300 to $500,000.”
After Mr. Lyons testified, his attorney asked the trial court to confirm a default against Mr. Clouden and to render judgment against Mr. Clouden in the amount of $75,000.00. The trial court rendered judgment in that amount. The default judgment has not been appealed, and it is now a final judgment against Mr. Clouden.
The Trial Testimony

Travis Lyons

Mr. Lyons testified at the trial of the action by II Fire against Forefront and Inner City. He reiterated some of his testimony from the hearing on the Lconfirmation of the default against Mr. Clouden, but he also presented additional testimony.
Mr. Lyons testified at length regarding his status in the community as a youth leader and mentor who had won numerous awards for his work with inner city youth. Mr. Lyons also stated that II Fire records sponsored a rally to stop violence. He further claimed that his reputation as a youth leader had been damaged by the types of videos that Mr. Clouden had made for Forefront and Inner City, because the videotapes and CDs contained hard-core adult entertainment.
Additionally, as a result of the work Mr. Clouden did for Forefront and Inner City, the Formaldehyde “distribution deal didn’t happen.” Someone from Formaldehyde advised Mr. Lyons that there was an article in a national music magazine stating that Mr. Wicked had signed a contract with Forefront. Therefore, Formaldehyde *1275 contended that II Fire had breached its contract with Formaldehyde. Mr. Lyons also stated that around the time that the article appeared, Mr. Clouden began to fail to appear at shows that had been scheduled by II Fire to promote his career.
Mr. Lyons stated that he had been contacted by Kim Hicks on behalf of Forefront. Forefront wanted to purchase Mr. Clouden’s contract from II Fire. According to Mr. Lyons’ testimony, Ms. Hicks advised him that Mr. Clouden had told her that he did not want to remain under contract with II Fire. Mr. Lyons quoted her a purchase price for the contract of “$20,000, $25,000, half of what I spent on him for the contract.” Ms. Hicks advised Mr. Lyons that her company could not afford to pay that much, and she offered to pay II Fire $4,000.00 for the II Fire Contract. Mr. Lyons testified that II Fire did not agree to sell the II Fire Contract to Forefront for $4,000.00. Despite the lack of an agreement to sell the II | 5Fire Contract to Forefront, Mr. Clouden nevertheless appeared on several videotapes and CDs for Forefront and Inner City without permission from II Fire. Those appearances violated the terms of the II Fire Contract. References to Mr. Clouden appearing as Mr. Wicked were placed on the Forefront website, and there was a reference on the website to the acquisition of Mr. Wicked’s services for “20 gs.”
Mr. Lyons admitted that Ms. Hicks had asked him to send her a copy of the II Fire Contract so that she could determine what its terms and conditions were. He refused, however, to permit Ms. Hicks to review the contract until she had agreed to purchase it.
Mr. Lyons contended that after Mr. Clouden appeared on the pornographic videos, people in the community began to associate Mr. Lyons with the pornographic movie industry. Such an association was the subject of strong community disapproval, because Mr. Lyons worked with youth and children in the community. He was no longer allowed to participate in the youth activities in which he had previously been involved. The loss of his reputation was very damaging to him personally.
Mr. Lyons also testified regarding a copy of a letter that he had received from Mr. Clouden’s lawyer. The letter stated that II Fire had made “no payments whatsoever” to Mr. Clouden despite the fact that he had “performed over 100 live shows and on several occasions recorded in studio.” The letter further stated that II Fire Records “has repeatedly and inexplicably refused Mr. Clouden’s numerous requests for copies of the agreements between himself and II Fire Records.” The letter then terminated “any and all agreements between himself and II Fire Records, effective immediately.” An Acknowledgment and Release Agreement lfiwas enclosed with the letter, and the letter stated that “[i]f we have not received this release document properly executed within ten (10) days of your receipt of this correspondence, be advised that we will seek alternative legal remedies against II Fire Records for rescission of the agreements ... as well as recovery for bad faith mismanagement and breach of fiduciary duties, [and] unjust enrichment. ...” Mr. Lyons denied that he ever received the release document that was enclosed with the letter.
Although II Fire was Mr. Lyons’ first venture into the music business, he testified that he had a lot of experience in that business, particularly the work he did in connection with his brother’s music career. Mr. Lyons also thought that Mr. Clouden *1276 was a very talented artist, who would do very well as a rap musician. Finally, however, Mr. Lyons testified that “[n]ot a dime” was earned from II Fire’s contract with Mr. Clouden. When Mr. Lyons was asked whether he had any way to testify with any degree of probability or certainty regarding how much money he could have made with respect to Mr. Clouden, Mr. Lyons agreed that he could not.

Kim Hicks

Ms. Hicks testified that she was employed by Forefront and Inner City and that she was in charge of the day-to-day operations of the companies. She stated that Forefront was a record company and that Inner City was a video production company that primarily produced adult videos. Forefront’s artists created the music for the adult videos produced and marketed by Inner City.
Ms. Hicks testified that her first contact with Mr. Lyons involved a work for hire agreement pursuant to which Mr. Clouden appeared in part of one song on the videotape and accompanying CD entitled “Generation XXX.” Ms. Hicks stated that when she approached Mr. Clouden about working on the song, he told her that 17he had signed a contract with II Fire. Therefore, she was required to get II Fire’s permission to record that one part of the song. II Fire agreed to permit Mr. Clouden to make the recording in exchange for a payment of $300.00. It was not necessary for Ms. Hicks to review the II Fire Contract in connection with the work for hire agreement, because the agreement covered only one specific appearance by Mr. Clouden.
Ms. Hicks testified that Mr. Clouden told her that the II Fire Contract had a term of one year. When Ms. Hicks attempted to enter into negotiations with II Fire to purchase the II Fire Contract, she initially offered to buy it for $4,000.00, but her offer was rejected. Ms. Hicks further testified, however, that when Mr. Lyons rejected her offer, he said that if she “came with $20,000, then we could talk.” Ms. Hicks said that Mr. Lyons wanted her to increase the purchase price for which she had offered to buy the II Fire Contract before he would let her see the contract. Ms. Hicks stated that “I definitely wasn’t going to tell him, yeah, I’ll give you $20,000 for something that I didn’t even know actually existed or hadn’t expired or hadn’t run out.”
Ms. Hicks further stated that when she again contacted Mr. Lyons to see whether he had changed his mind about his refusal to allow her to review the II Fire Contract, he “was more talking about the problems that he had with Wicked and you know all the personal problems he had as opposed to actually selling the contract or just letting me see the contract.” Ms. Hicks then advised Mr. Clouden to try to obtain a copy of the II Fire Contract from Mr. Lyons. When Mr. Lyons refused to provide a copy of the II Fire Contract to Mr. Clouden, Ms. Hicks advised him to hire an attorney to try to get a copy of the II Fire Contract.
IjjMr. Clouden did hire an attorney, who wrote a letter to Mr. Lyons terminating the II Fire Contract. Mr. Clouden gave a copy of the letter from the attorney to Ms. Hicks. Ms. Hicks testified that she then had a conversation with Mr. Lyons about producing a copy of the contract, but he refused to allow her to see it.
Mr. Clouden then signed a contract with Forefront (the “Forefront Contract”). Ms. Hicks testified regarding the circumstances under which the Forefront Contract was signed. She stated the following at the trial:
*1277 Wicked bought [sic] us a copy of that letter. I had a conversation with Travis; he refused to produce the contract. I never saw the contract and then the fact that Wicked said he believe [sic] it was for a year. That year was either up or had already come to an end.
So based on those things, and based on us actually getting Wicked to sign the contract with the warranty clause that says that we’re not infringing on anyone else’s right by him signing this agreement. That’s why we went ahead and signed it.
Ms. Hicks further testified that once Forefront and Inner City were served with a lawsuit involving the II Fire Contract, “we stopped all of our work with Wicked until we ... determined ... what the status of the contract was.” Forefront and Inner City then ceased all dealings with Mr. Clouden. Finally, Ms. Hicks testified that after the Forefront Contract was signed but before the lawsuit had been served, very brief recordings of Mr. Cloud-en’s music appeared on some videotapes and CDs for Forefront and Inner City.

Expert Witnesses

One expert witness testified at the trial, and the depositions of two expert witnesses were introduced into evidence. The expert testimony described the | sprocess for manufacturing, producing, and distributing recordings of rap and other types of music.
Kairi I. Brown and John Shaw testified as expert witnesses on behalf of II Fire. Mr. Brown, whose deposition was introduced into evidence, testified that he was a music manager with his own production company. He affirmed that the music industry is “pretty speculative.” Mr. Shaw, whose deposition was also introduced into evidence, testified that he worked in the field of music promotion and distribution in the urban market, particularly distribution and promotion of rap music. Mr. Shaw stated that whether or not a particular artist will be successful in the music industry is “extremely speculative.” He explained that the buying public is “unpredictable” and that “[t]hey’ll pass over a talented artist and buy some garbage that they like because the radio has now convinced them that they like it.”
Harris Green Lee Rea, III testified at the trial as an expert witness on behalf of Forefront and Inner City. He was qualified as an expert regarding the music and recording industry. Mr. Rea was asked whether the efforts made by Forefront in trying to obtain the II Fire Contract and in trying to determine whether Mr. Cloud-en was, in fact, free to contract with Forefront “really exceeded what normally happens in business.” Mr. Rea further stated that it is the industry standard for a recording company to give another company a copy of the contract of an artist who is under contract with the recording company, if the other company is also interested in contracting with the artist. This is done so that the second company can determine what rights it might be able to obtain with respect to the artist.
Mr. Rea testified that all recording artists switch from one recording company to another but that rap artists switch companies more frequently than | inother types of musicians. He further stated that switching from one recording company to another is an accepted industry practice. Mr. Rea said that it is impossible for anyone to predict the amount of sales that would result from a particular distribution agreement. Finally, Mr. Rea testified that “[a]n unknown artist or an unknown label with a *1278 very small distributing company would have a minuscule chance of success.”

Other Witnesses

Derrick Gibson, the president and chief executive officer of Forefront and Inner City, testified that he and his wife, Ms. Hicks, had founded both of the companies. He further testified that his wife was primarily responsible for the negotiations involving Mr. Clouden and II Fire. He also said that Mr. Clouden had never signed a contract with Inner City. He had contracted only with Forefront.
Ronald Coleman, a community leader, also testified at the trial. He explained how the association between Mr. Clouden and pornographic movies had adversely affected Mr. Lyons’ standing in the community and his volunteer work with the youth of the community.
Finally, Jeffery Johnson, Sr., a cameraman and “street salesperson” for Forefront and Inner City, testified. His testimony concerned a discrepancy between the testimony of Mr. Lyons and of Ms. Hicks regarding the release date and the sales of the videotape entitled “Generation XXX.”
Trial Court Judgment
The trial court rendered judgment in favor of Forefront and Inner City on the fraud and unfair trade practices claims that had been asserted against them by II Fire. The trial court, however, rendered judgment in the amount of $249,672.82 in favor of II Fire on a claim of conversion.
|nIn the reasons for judgment issued by the trial court judge, the judge stated that she had found that the elements required to be proven to show fraud or to show unfair trade practices under the Louisiana Unfair Trade Practices and Consumer Protection Law[2] had not been proven. The trial court judge did, however, find that II Fire had proven that Forefront and Inner City had committed the tort of conversion. Therefore, II Fire had a claim for unjust enrichment against Forefront and Inner City. In the reasons for judgment, the trial court judge stated that she had based the amount of the damages awarded to II Fire on the testimony and evidence presented by Mr. Lyons. He had presented evidence that he had spent $49,672.82 promoting Mr. Clouden, and he testified that he had lost between $200,000.00 and $500,000.00 in profits as a result of the actions of Mr. Clouden, Forefront, and Inner City.
Appeal
Forefront and Inner City appealed the trial court’s judgment, raising as assignments of error the trial court’s reliance on the theory of unjust enrichment in awarding damages to II Fire and the trial court’s finding that II Fire was impoverished and that Forefront and Inner City were enriched. II Fire did not answer the appeal.
Exception of Prescription
After the appeal was lodged, Forefront and Inner City filed an exception of prescription asserting that conversion is a tort to which a one-year prescriptive period applies. Forefront and Inner City asserted that suit was not filed against |12them within the one-year prescriptive period that began when II Fire discovered that Mr. Clouden had signed the Forefront Contract.
DISCUSSION
Conversion
The judgment against Forefront and Inner City held them liable for the *1279 tort of conversion. In Dual Drilling Co. v. Mills Equipment Investments, Inc., 98-0343, 98-0356 (La.12/1/98), 721 So.2d 853, the Louisiana Supreme Court discussed the tort of conversion. The Supreme Court stated:
This action is grounded on the unlawful interference with the ownership or possession of a movable and is frequently termed an action for “conversion” in Louisiana. A conversion is committed when any of the following occurs: 1) possession is acquired in an unauthorized manner; 2) the chattel is removed from one place to another with the intent to exercise control over it; 3) possession of the chattel is transferred without authority; 4) possession is withheld from the owner or possessor; 5) the chattel is altered or destroyed; 6) the chattel is used improperly; or 7) ownership is asserted over the chattel.
98-0343, 98-0356, p. 4, 721 So.2d at 857.
In Quealy v. Paine, Webber, Jackson & Curtis, Inc., 475 So.2d 756 (La.1985), the Louisiana Supreme Court defined the term “conversion.” The Supreme Court stated that “[a] conversion consists of an act in derogation of the plaintiffs possessory rights, and any wrongful exercise or assumption of authority over another’s goods, depriving him of the possession, permanently or for an indefinite time, is a conversion. See also Delort Hardware Co. v. Peoples Bank and Trust Co., 490 So.2d 547, 548 (La.App. 4th Cir.1986).
We have reviewed the evidence in the instant case, and we do not find that either Forefront or Inner City committed the tort of conversion as it has been | ^defined by the Louisiana Supreme Court and by this Court. What was involved in the instant case was the execution of a contract by Mr. Clouden in favor of Forefront in derogation of the contract rights of II Fire. We also find that Forefront acted in a reasonably prudent business manner and in conformity with the recording industry standards in attempting to ascertain whether or not Mr. Clouden was contractually obligated to II Fire. Additionally, there was never a contractual relationship between Mr. Clouden and Inner City. Based on the foregoing, we reverse the trial court’s judgment holding Forefront and Inner City liable for conversion.
Prescription
We have found that Forefront and Inner City were not liable to II Fire on the grounds of conversion. Therefore, we need not decide the issues that were raised in the exception of prescription that was filed.
Assignments of Error

Assignment of Error Number One: The trial court erred in allowing an unjust enrichment claim.

In her reasons for judgment, the trial court judge stated that II Fire was entitled to recover from Forefront and Inner City on the basis of unjust enrichment, because unjust enrichment is one of three causes of action for conversion. In support of her statement, the trial court judge cited Gibbs v. Harris, 35,239 (La.App. 2 Cir. 10/31/01), 799 So.2d 665, a case involving the conversion of a tenant’s personal property by a landlord who removed the property from the rented premises without authorization and placed it in a public storage facility.
The court in Gibbs stated that “[t]he three causes of action for conversion in Louisiana are: 1) the revendicatory action for the recovery of the movable, 2) the *1280 | uaction for unjust enrichment, and 3) the delictual action arising from an offense or quasi offense.” 799 So.2d at 670. Relying on the quoted language, the trial court judge determined that damages in the instant case should be awarded on the basis of unjust enrichment.
La. Civil Code art. 2298 establishes that there is a remedy for unjust enrichment. Article 2298 provides in relevant part:
A person who has been enriched without cause at the expense of another person is bound to compensate that person. The term “without cause” is used in this context to exclude cases in which the enrichment results from a valid juridical act or the law. The remedy declared here is subsidiary and shall not be available if the law provides another remedy for the impoverishment or declares a contrary rule.
(Emphasis added.)
In Baker v. Maclay Properties Co., 94-1529 (La.1/17/95), 648 So.2d 888, 897, the Louisiana Supreme Court enumerated the requirements that must be shown to prove a claim for unjust enrichment. The Supreme Court stated:
The five requirements for a showing of unjust enrichment ... are: (1) there must be an enrichment, (2) there must be an impoverishment, (3) there must be a connection between the enrichment and resulting impoverishment, (4) there must be an absence of “justification” or “cause” for the enrichment and impoverishment, and (5) there must be no other remedy at law available to plaintiff.
See also Quilio & Associates, Inc. v. Plaquemines Parish Gov’t, 05-0803, p. 12 (La.App. 4 Cir. 5/10/06), 931 So.2d 1129, 1137, writ denied, 06-1442 (La.9/29/06), 937 So.2d 850.
In the instant case, it is clear that the fifth requirement for proving unjust enrichment cannot be met, because II Fire had a remedy against Mr. Clouden. In |1Kfact, II Fire has a final judgment against Mr. Clouden. We need not determine whether Forefront and Inner City were unjustly enriched at the expense of II Fire, because II Fire’s remedy was against Mr. Clouden. It is clear that Mr. Clouden was the party who was contractually obligated to II Fire. Had he complied with the II Fire Contract, Forefront and Inner City would not even be involved in this lawsuit. If Mr. Clouden breached his contract with II Fire, then Mr. Clouden, not Forefront and Inner City, is the responsible party. He caused the situation that is the subject of the instant case to exist, and II Fire’s remedy was against him. This assignment of error has merit.

Assignment of Error Number Two: The trial court erred in finding that II Fire was impoverished or that Forefront was enriched as a result of the actions that transpired with Mr. Clouden.

We have determined that II Fire had a remedy other than a suit for unjust enrichment. Therefore, we need not address this assignment of error.
DECREE
The judgment of the trial court is reversed insofar as it rendered judgment against Forefront and Inner City on the claim of conversion in the amount of $249,672.82. The judgment of the trial court is affirmed insofar as it rendered judgment in favor of Forefront and Inner City on the claim of fraud and the claim under the Louisiana Unfair Trade Practices and Consumer Protection Law. All claims against Forefront and Inner City are hereby dismissed. *1281 AFFIRMED IN PART AND REVERSED IN PART; CLAIMS DISMISSED.

. Mr. Lyons testified at the trial that he assigned the II Fire Contract to II Fire, which he solely owned. Therefore, II Fire will be referred to as the contracting party under the II Fire Contract.

. La. R.S. 51:1401 et seq.