EAST BATON ROUGE PARISH SEWERAGE COMMISSION AND THE PARISH OF EAST BATON ROUGE,
v.
JOCK BANKS, CHARRON BANKS, LON E. ROBERSON AND DOUG WELBORN, EAST BATON ROUGE PARISH CLERK OF COURT.
No. 2009 CA 0107.
Court of Appeals of Louisiana, First Circuit.
April 1, 2010.
Not Designated for Publication
MARY ROPER, LEO J. D'AUBIN, ROBERT H. ABBOTT, GWENDOLYN K. BROWN, Baton Rouge, Louisiana, Counsel for Plaintiffs-Appellees, East Baton Rouge Parish Sewerage, Commission and East Baton, Rouge Parish.
MILTON OSBORNE, Jr., JENARD M. YOUNG, Baton Rouge, Louisiana, Counsel for Defendant-Appellant, Lon E. Roberson.
V. CHARLES CUSIMANO, BARON M. ROBERSON, Baton Rouge, Louisiana, Counsel for Defendants-Appellees, Jock Banks and Charron Banks.
CYRUS J. GRECO, KARI A. BERGERON, CYNTHIA MORGAN AEDEE, Baton Rouge, Louisiana, Counsel for Defendant-Appellee, Doug Welborn, East Baton Rouge Parish, Clerk of Court.
Before: PARRO, KUHN, and McDONALD, JJ.
KUHN, J.
Plaintiffs-appellants, the East Baton Rouge Parish Sewerage Commission and the Parish of East Baton Rouge (collectively, "the Parish"), filed this suit against defendants, Jock Banks and his wife, Charron Banks ("the Bankses"); their attorney, Lon E. Roberson; and. Doug Welborn, in his capacity as East Baton Rouge Parish Clerk of Court ("the Clerk"). Charron Banks and her mother-in-law, Daisy M. Banks, were the record owners of property, which was the subject of an expropriation suit previously filed by the Parish. Roberson negotiated a settlement of the expropriation suit on behalf of the Bankses.
In the instant suit, the Parish seeks to recover a significant portion of funds that it had deposited in the registry of the Nineteenth Judicial District Court in conjunction with the expropriation suit. The Clerk disbursed the funds in question to Roberson, who then distributed the funds. After the Parish demanded the return of the funds to no avail, it filed this suit.[1] The trial court found all parties to be negligent, assessed comparative fault, and recognized a bankruptcy discharge in favor of the Bankses, absolving them from payment of their liability in these proceedings. Based on these findings, the trial court rendered judgment in favor of the Parish and against Roberson and the Clerk. Roberson appealed, and the Clerk answered the appeal. We reverse in part, amend in part, and as amended, affirm in part.

I. PROCEDURAL AND FACTUAL BACKGROUND
To accomplish the expansion of a wastewater treatment plant, the Parish and one of its contractors, Bob Brothers Construction Co., L.L.C. ("Boh Bros."), began negotiations with the Bankses to relocate the house in which they resided, which was located at 10035 Avenue M in Baton Rouge, Louisiana.[2] The Parish planned to acquire the property by either purchasing it or by expropriating it. The highest appraisal obtained for the property and improvements was $50,000.00.
Aubrey McCleary, counsel for Boh Bros., testified that the first meeting with the Bankses to discuss acquisition of the property was held in Roberson's office in June 1997. According to the testimony of McCleary and Jacques Saucier, a Boh Bros. employee and the project manager for the expansion project, Bob Bros. needed the Bankses' house moved quickly so its project with the Parish would not be delayed, and it offered $45,000.00 in funds to facilitate the purchase of another lot on which the Bankses' house could be relocated.[3] McCleary testified that Roberson represented the Bankses in a heated negotiation regarding this proposal. Saucier testified that Roberson did most of the talking at this meeting.
On June 25, 1997, Roberson made a counter offer on the Bankses' behalf, wherein they sought to have Boh Bros. bear the cost of purchasing a "new lot," moving the house to the new lot, "[paying] the remaining mortgage on the property [sought to be expropriated] ... which is approximately $70,866.00," and paying for other improvements, with a total cost to Boh Bros. of $102,296.00. Bah Bros. responded by letter, instructing Roberson to direct his correspondence to the Parish.
In a July 14, 1997 letter from Larry D. Book, Special Assistant Parish Attorney, addressed to Daisy Banks and Charron Banks, but sent to the care of Roberson, the Parish advised that it intended to expropriate the Avenue M property, and it set forth the appraisal information pertaining to the land and all improvements. The letter further advised that if all improvements were removed by August 5, 1997, the Parish would expropriate only the land. On July 28, 1997, the Parish filed a petition to expropriate the Avenue M property and deposited $50,000.00 in the court registry.
Subsequent negotiations were held at McCleary's office, with Roberson representing the Bankses. Book testified that the Bankses were ultimately presented with two options: 1) receive $50,000.00 in compensation for the land and improvements located thereon; or 2) relocate the house and retain ownership, with Boh Bros. agreeing to pay to relocate the house on another lot purchased in the name of the Bankses and to make other improvements, such as lot clearing, landscaping, and installation of a driveway.[4] If the latter option were chosen, the Parish would expropriate the land only, which was valued at $13,500.00.
On August 12, 1997, the Bankses, Daisy Banks, and a Boh Bros. representative signed an agreement regarding the relocation of the house in question, which provided that Boh Bros. would: 1) advance $15,000.00, plus closing costs to permit the Bankses to buy two lots in Monteray Subdivision; 2) advance moving costs in the amount of $11,000.00, plus start-up and living expenses; 3) provide the legal work to obtain the release of the mortgage on the Avenue M property and to substitute security on the Monteray property; and 4) pay a balance of $45,000.00 less all itemized expenses and all attorneys' fees and costs. In return, the Bankses and Daisy Banks agreed they would complete the sale of the Avenue M property to the Parish and execute other related legal documents.
On August 21, 1997, Book sent a letter to Celestine Jemison, an employee of the Clerk's office, who handled matters pertaining to the Clerk's registry account. The letter advised Jemison that "no money should be released [in the expropriation suit] unless a Joint Petition with [the Office of the Parish Attorney] has been filed." The letter further advised:
Mrs. Daisy Banks has filed Chapter 7 Bankruptcy and the trustee [of the Estate of Daisy Banks], Ms. Samera Abide, should now be considered the owner of all of [Daisy Banks'] interest in the money."... Mrs. Banks has moved the improvements off of the lot and we will shortly be filing an Amended Petition to reduce the amount of compensation to which she is entitled to not more than ... [$13,500.00] and will ask that any sums in excess of that amount be released from the Registry of the Court back to the Parish ....
On October 24, 1997, Jock, Charron, and Daisy Banks signed a "Receipt and Release" document, which acknowledged: 1) their agreement with Boh Bros.; 2) Boh Bros. either paid to them or paid on their behalf $45,000.00; and 3) they were obligated to complete the sale of the Avenue M property and related legal documents. Roberson witnessed their signatures on this document.
Thereafter, the Parish filed an amended petition in the expropriation suit, which named as additional defendants, Jock Banks and Abide, in her capacity as bankruptcy trustee. The amended petition in the expropriation suit explained that: 1) the residence located on the Avenue M property had been removed and just compensation for the property was no greater than $13,500.00; 2) since the filing of the petition for expropriation, the Parish learned that Daisy Banks had previously filed the bankruptcy proceeding; and 3) Abide asserted a claim to a portion of the funds deposited into the court registry by the Parish, based on Daisy Banks' claim that she had loaned Jock and Charron Banks funds to purchase the Avenue M property.[5] Although Roberson had not yet enrolled as an attorney of record in the expropriation proceedings, Book sent him a courtesy copy of the amended petition.
On November 5, 1997, the trial court signed a judgment, directing that the amount deposited by the Parish into the court registry be reduced to $13,500.00, plus interest on that amount from the date of the original deposit, and further ordering the Clerk to issue a check to the Parish for the balance of the funds.
In January 1998, Abide drafted a consent judgment in the expropriation suit, which Roberson hand-delivered to the trial court.[6] This judgment was signed on January 21, 1998, and provided, in pertinent part, as follows:
IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT of the amount held in the [court registry], the funds be disbursed as follows: $10,000.00 plus any interest accrued thereon to Daisy Banks and [Abide], trustee of the Estate of Daisy Banks, ... and the remaining funds be paid to Jock Banks, Charron Banks and their attorney, Lon E. Roberson.
Roberson and Abide signed the consent judgment, indicating that its substance and form had been consented to by them.[7]
Based on the consent judgment, Jemison disbursed the funds in the court registry on January 27, 1998, by issuing two checks to Roberson.[8] The first was in the amount of $10,020.55 and was made payable to "Daisy Banks and [Abide, as trustee of the Estate of Daisy Banks]," which Roberson delivered to Abide. The second check was in the amount of $40,721.48, and was made payable to "Jock Banks, Charron Banks, and their attorney, [Roberson]."[9] This second check was endorsed by all payees and deposited in Roberson's attorney-trust checking account. From this account, Roberson disbursed funds in accordance with Jock Banks' directions: $1,168.17 to Ed Price Building Material; $3,000.00 to Joyce Banks, Roberson's secretary and Jock Banks' sister; $32,721.48 to Jock and Charron Banks, and $3,000.00 to himself.[10] Roberson maintained that he did not charge Jock and Charron Banks for his services in connection with the expropriation matter and that the payment was for legal services previously rendered, which were unrelated to the expropriation matter.[11]
On April 13, 1998, Book learned that the Clerk had not disbursed the funds in accordance with the November 5, 1997 judgment. Book then contacted Roberson, who acknowledged that he had withdrawn all of the funds from the court registry. The Bankses testified that they spent these funds within a few days to a week of its receipt, with the money going towards their bills. In 2001, the Bankses filed a petition for a Chapter 7 bankruptcy, which listed the Parish as a creditor, and later that year, a bankruptcy discharge was granted.
In its petition, the Parish claimed that: 1) the Clerk negligently disbursed the funds, resulting in the Bankses and Roberson being overpaid by $36,500.00, plus interest; 2) the Bankses and Roberson were aware of the terms of the settlement and knew there was no justification or legal cause for the excessive amount of the check issued to them by the Clerk; and 3) the Bankses and Roberson were unjustly enriched by the disbursement. The Parish sought to recover $36,500.00, plus interest from July 28, 1997, the date the expropriation suit was filed, until paid.
The trial court determined that the Parish was not entitled to compensation based on La. C.C. art. 2298 because the Bankses' and Roberson's enrichment had resulted from a valid juridical act, i.e., the January 21, 1998 consent judgment.[12] The trial court found that while there was "no evidence that the taking of [the funds] was willful or intentional on the part of any of the parties," all of the defendants had been negligent and that the Parish also bore some fault. The trial court assessed fault as follows: 1) 60 percent fault to Roberson, reasoning that he had a fiduciary duty to deal properly with the funds deposited into the court registry and further finding that he should have known the disbursement was excessive; 2) 5 percent fault to the Bankses because they either knew or should have known that the disbursement was excessive; 3) 15 percent fault to the Clerk, because the Clerk had in its possession the amended petition and judgment that reduced the amount to be maintained in the court registry; and 4) 20 percent fault to the Parish, because it filed the amended petition with the Clerk's office directly rather than delivering it to Jemison according to the Parish's usual practice, and further, the Parish took no action to ensure that the funds were refunded.
In accordance with these reasons, the trial court signed an April 20, 2005 judgment in favor of the Parish and against Roberson in the amount of $22,295.01,[13] together with legal interest thereon from November 23, 1998, until paid, and assessed 60 percent of the court costs against Roberson.[14] This judgment further ordered judgment in favor of the Parish and against the Clerk in the amount of $5,573.75,[15] together with legal interest thereon from November 23, 1998, until paid, and assessed 15 percent of court costs against the Clerk. The judgment further recognized the bankruptcy discharge that absolved the Bankses from payment of their liability in these proceedings.
Roberson appealed, urging the trial court erred in: 1) finding that he owed and breached a fiduciary duty to both the Clerk and the Parish; 2) ordering him to pay damages to the Parish because there was no evidence of a tort committed by him; and 3) in finding him 60 percent at fault.
The Clerk answered the appeal, urging the trial court erred in finding liability on his part.

II. ANALYSIS

A. The Clerk's Conduct
We find merit in the Clerk's contention that liability was improperly imposed on him. Louisiana Revised Statutes 13:760 provides, in pertinent part:
No clerk of court and no deputy of such officer who performs any act or issues any order in conformity with the written order or judgment of any judge of a court in this state shall be liable in either his individual or official capacity to any person, firm, or corporation for any damage as the result of such action.
Based on this provision, because Jemison disbursed the funds based on the January 21, 1998 consent judgment, the Clerk is not liable for any damages resulting from this disbursement. Covington Pontiac-Buick-GMC Trucks, Inc. v. AAA Sewer and Water Fabrication and Service, L.L.C., 02-2676, pp. 7-8 (La. App. 1st Cir. 2/13/04), 873 So.2d 56, 60-61, writ denied, 04-0651 (La. 517/04), 872 So.2d 1082. Thus, the trial court erroneously imposed liability on the Clerk, and that portion of the judgment in favor of the Parish and against the Clerk assessing damages and costs is reversed.[16]

B. Roberson's Conduct
Roberson contends that any duty he owed in connection with the funds he received was owed only to his clients and not to the Parish. Further, he asserts there was no evidence establishing that he knew or should have known that the funds he received from the Clerk was more than his clients were entitled to receive.
Generally, whether a fiduciary duty exists, and the extent of that duty, depends upon the facts and circumstances of the case and the relationship of the parties. Scheffler v. Adams and Reese, L.L.P., 06-1774, p. 6 (La. 2/22/07), 950 So.2d 641, 647. As a basic proposition, for a fiduciary duty to exist, there must be a fiduciary relationship between the parties. Id. One is said to act in a fiduciary capacity "when the business which he transacts, or the money or property which he handles, is not his own or for his own benefit, but for the benefit of another person, as to whom he stands in a relation implying and necessitating great confidence and trust on the one part and a high degree of good faith on the other." Id., 06-1774 at pp. 6-7, 950 So.2d at 647 (quoting Slate v. Hagerty, 251 La. 477, 492, 205 So.2d 369, 374-75 (1967), quoting BLACK'S LAW DICTIONARY (4th ed. 1951)).
The Louisiana Supreme Court has adopted the "traditional, majority view that an attorney does not owe a legal duty to his client's adversary when acting on his client's behalf." Scheffler, 06-1774 at p. 14, 950 So.2d at 652. A non-client, therefore, cannot hold his adversary's attorney personally liable for either malpractice or negligent breach of a professional obligation. Montalvo v. Sondes, 93-2813, p. 4 (La. 5/23/94), 637 So.2d 127, 130. Based on the facts considered herein, Roberson does not owe a fiduciary obligation to the Parish. However, he can be held accountable to the Parish, a non-client, for intentional tortious conduct. See Penalber v. Blount, 550 So.2d 577, 578 (La. 1989). Intentionally tortious actions, ostensibly performed for a client's benefit, will not shroud an attorney with immunity. Thus, although an attorney does not generally owe a duty to his client's adversary, under the broad ambit of La. C.C. art. 2315, an attorney may be held personally accountable for his intentional tortious conduct. Id. at 582.
In the instant case, the petition alleged and the evidence established that the Bankses and Roberson were aware of the specific settlement terms and knew there was no justification for the amount withdrawn from the court registry, but despite this knowledge, Roberson and the Bankses endorsed the check, and the funds were disbursed and spent. While the trial court found this conduct not intentional, based on the entirety of the record, we conclude that a reasonable factual basis does not exist for this finding, and it is manifestly erroneous. See Stobart v. State Through Dep't of Transp. and Dev., 617 So.2d 880, 882 (La. 1993).
In Caudle v. Betts, 512 So.2d 389, 391 (La. 1987), the court addressed the intent required for an intentional tort:
The intent with which tort liability is concerned is not necessarily a hostile intent, or a desire to do any harm. Restatement (Second) of Torts, American Law Institute § 13, (comment e) (1965). Rather it is an intent to bring about a result which will invade the interests of another in a way that the law forbids. The defendant may be liable although intending nothing more than a good-natured practical joke, or honestly believing that the act would not injure the plaintiff, or even though seeking the plaintiffs own good. W. Prosser and W. Keeton, The Law of Torts, § 9 (5th ed. 1984).
See Penalber, 550 So.2d at 582 (quoting Caudle to address the basic difference between an intentional tort and a negligent act).
In the present case, there is no question that Roberson attended the various meetings in which the details of the relocation of the house were negotiated. Because the Bankses elected to move their house from the Avenue M lot, Roberson knew that the expropriation proceedings would proceed as to the land only and that the Parish had amended its petition, seeking a reduction of the funds in the court registry to $13,500.00, the uncontested value of the lot. Roberson also knew that of the $13,500.00 that was supposed to remain in the court registry after the filing of the amended petition, the bankruptcy trustee was entitled to receive $10,000.00, plus accrued interest. The evidence reveals that Roberson received a copy of the amended petition that prayed for the reduction from $50,000.00 to $13,500.00, and Roberson signed the consent judgment acknowledging the portion due to the trustee in Daisy Banks' bankruptcy. Despite his involvement in all of the negotiations and proceedings that transpired between June 1997 and January 1998, Roberson offered no explanation to justify his conduct of withdrawing and disbursing to his clients $40,721.48, as opposed to the $3,500.00, plus accrued interest, that his clients were entitled to receive. Roberson knew such conduct would cause direct harm to the Parish, and even if Roberson reasoned that his conduct was in some way justified as beneficial to his clients, it cannot be classified as anything other than intentional.[17]

C. The Parish's Conduct
Roberson argues that any harm suffered by the Parish was caused by the Parish's failure to withdraw its funds from the court registry before he sought to remove funds in accordance with the consent judgment. Although the trial court apportioned fault to the Parish, we note the Parish owed no duty to protect its funds from conversion by another person from the court registry. The conversion resulted when Roberson removed the excess funds from the court registry and distributed them, and the Bankses spent the funds and refused to return them.[18] See Dual Drilling Co. v. Mills Equip. Investments, Inc., 98-0343, pp. 4-5 (La. 12/1/98), 721 So.2d 853, 857. Accordingly, we conclude the trial court committed legal error in assessing fault to the Parish.

D. Comparative Fault Allocation
Roberson contends that the trial court's 60 percent fault allocation to him was excessive. Because the trial court committed legal error in imposing liability on the Parish, and this error interdicted its comparative fault analysis, this court is required to make a de novo determination of the comparative fault of the remaining parties. See Landry v. Bellanger, 02-1443, p. 15 (La. 5/20/03), 851 So.2d 943, 954; Wallmuth v. Rapides Parish School Bd., 01-1779, p. 7 n.2 (La. 4/3/02), 813 So.2d 341, 345 n.2.
In determining percentages of fault, a court must consider the nature of the conduct of the parties and the extent of the causal relationship between the conduct and the damages claimed. Watson v. State Farm Fire and Casualty Ins. Co., 469 So.2d 967, 974 (La. 1985). In assessing the nature of the conduct of the parties, various factors (the Watson factors) may influence the degree of fault, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger; (2) how great a risk was created by the conduct; (3) the significance of what was sought by the conduct; (4) the capacities of the actor, whether superior or inferior; and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. Clement v. Frey, 95-1119, p. 8 (La. 1/16/96), 666 So.2d 607, 611.
After carefully reviewing and considering the Watson factors, we assign 75 percent fault to Roberson, 20 percent fault to the Bankses, and 5% to the Clerk. The Bankses participated in the negotiations pertaining to the Avenue M property and were sufficiently apprised of the facts and figures involved. Based on this information, they should have known the amount disbursed to them was in error and should have returned the excess funds. However, we also consider them to have been in an inferior position to Roberson based on the fiduciary relationship that existed because of the attorney/client relationship. Roberson was in a superior position to correct the error and should have promptly done so before disbursing the funds to the Bankses. If he had taken such action, the Bankses would not have had the opportunity to expend the funds. Likewise, Roberson was in a position to return the funds to the Clerk after the funds were released in light of his knowledge that the Parish's amended petition prayed for a reduction of the $50,000.00 deposit to $13,500.00.
Accordingly, because our de novo fault allocation imposes a higher percentage of fault on Roberson than the trial court's allocation, we find no merit in Roberson's contention that the judgment against him should be reduced. On the other hand, although our reallocation of fault has imposed a higher assessment on Roberson than the trial court's allocation, the Parish is not entitled to a modification of the judgment in its favor based on this reallocation because it has not appealed or answered the appeal. See La. C.C.P. art. 2133A; Matthews v. Consolidated Companies, Inc., 95-1925, pp. 1-2 (La. 12/8/95), 664 So.2d 1191, 1191-92; see also Nunez v. Commercial Union Ins. Co., 00-3062, p. 2 (La. 2/16/01), 780 So.2d 348, 349, writs denied, 00-3049, 00-3057 (La. 2/16/01), 786 So.2d 97. Therefore, that portion of the trial court's judgment rendered in favor of the Parish and against Roberson is affirmed.

III. CONCLUSION
For the above reasons, we reverse that portion of the trial court's judgment rendered in favor of the Parish and against the Clerk, and we reverse that portion of the judgment that assessed 20 percent fault against the Parish. We amend that portion of the judgment assessing fault to the Bankses from 5 percent to 20 percent. Otherwise, the judgment is affirmed in all respects. Appeal costs are assessed against Roberson.
REVERSED IN PART, AMENDED IN PART, AND AS AMENDED, AFFIRMED IN PART.
NOTES
[1] Some of the defendants filed incidental demands that were ultimately dismissed and are not relevant to this appeal.
[2] On February 26, 1997, Charron Banks signed an affidavit stating that she and Daisy Banks purchased the house and lot in question, but that the house was purchased "in name only by Daisy M. Banks," and that "Daisy M. Banks made no payments ... upon the purchase of the house," and that "she [Charron] is the owner in fact of the house and lot...."
[3] According to the testimony of Larry D. Book, Special Assistant Parish Attorney, Bob Bros.' payments to the Bankses were not considered compensation for the expropriation. Boh Bros.' funds were available under its contract with the Parish to facilitate its work.
[4] The property in question was subject to mortgage loans with a $71,802.50 payoff at the time of the negotiations, which were to be transferred to the new property if the relocation option was chosen. Otherwise, if the Parish expropriated the house and the land, Book testified that the Bankses potentially could have ended up with no house, no land, and a deficiency judgment against them.
[5] On December 10, 1997, Daisy Banks executed an affidavit stating she made a $10,000 payment on the purchase of the Avenue M property for the Bankses and that she had not been repaid by them. On that same date, the Bankses also executed affidavits acknowledging the payment. Roberson notarized these affidavits.
[6] Abide also testified that Roberson hand-delivered an August 27, 1997 letter to her from the Parish that explained the Bankses' intention to move the house to a new lot and the Parish's plan to reduce the amount in the court registry to $13,500.00.
[7] The consent judgment, signed by Roberson, indicated that Roberson was "[a]ttomey for Jock and Charron Banks."
[8] Jemison testified that the $50,000.00 initially deposited in the court registry was placed in an interest-bearing account. She disbursed these funds in accordance with the January 21, 1998 judgment, which she had reviewed before issuing the checks to Roberson. Jemison stated that she did not see a contrary order prior to disbursing the funds.
[9] When Roberson sought release of the court registry funds based on the January 21, 1998 judgment, Jemison contacted Book to inquire about his position on releasing the funds, since Book's signature did not appear on the consent judgment. Book acknowledged that he told Jemison that $10,000.00 should be disbursed to the bankruptcy trustee and the balance of the remaining funds was to be distributed to the Bankses. When this phone conversation took place, Book's understanding was that the total funds in the court registry were $13,500.00, plus accumulated interest: he assumed that the balance of the initial funds had been disbursed to the Parish's finance office in accordance with the November 5, 1997 judgment. Book testified that Jemison did not mention that the disbursement had not been made to the Parish or that the balance of the account was over $50,000.00. Further, by letter dated January 27, 1998, Book advised Jemison that the Parish had "no objection to the release of all funds in accordance with the [January 21, 1998] Consent Judgment ...."
[10] Roberson's disbursements to himself and others totaled $39,889.65. He did not explain the $831.83 discrepancy between the disbursements and the amount received from the court registry.
[11] Jock Banks testified to the contrary, indicating he paid Roberson $1,500.00 for his representation pertaining to the expropriation matter and $1,500.00 for Roberson's representation of his brother in an earlier legal matter.
[12] Louisiana Civil Code article 2298 provides, in pertinent part:

A person who has been enriched without cause at the expense of another person is bound to compensate that person. The term "without cause" is used in this context to exclude cases in which the enrichment results from a valid juridical act or the law.
[13] The original $50,000.00 deposit less $13,500.00 for the value of the land expropriated, plus interest, left a remaining balance of $37,158.35. The sum of $22,295.01 was derived by multiplying the remaining balance by the 60 percent fault assessed to Roberson.
[14] A September 3, 2009 judgment reinstated that judgment effective as of September 3, 2009.
[15] This sum was calculated by multiplying the 15 percent fault assessed to the Clerk against the $37,158.35 balance.
[16] We note, however, that the trial court did not err in assessing a percentage of fault to the Clerk. In any action for damages where a person suffers loss, the degree or percentage of fault of all persons causing or contributing to the loss shall be determined regardless of immunity by statute. La. C.C. art. 2323.
[17] As an attorney and officer of the court, Roberson was obligated to "conduct himself at all times ... in a manner consistent with the dignity and authority of the court and the role which he himself should play in the administration of justice." La. C.C.P. art. 371. If an attorney's conduct violates the provisions of La. C.C.P. art. 371, the attorney subjects himself to punishment for contempt of court, and such further disciplinary action as is otherwise provided by law. See La. C.C.P. art. 371.
[18] Jock Banks testified that when it was brought to his attention that he had received too much money from the Parish, his response was, am not paying that money back. That is why I hired an attorney."